Louis G. JULIANO,* Plaintiff–Appellant–Cross–Appellee,

v.

THE HEALTH MAINTENANCE ORGANIZATION OF NEW JERSEY, INC., dba U.S. Healthcare, Defendant–Appellee–Cross–Appellant.

**Docket Nos. 98–9662(L), 99–7022(XAP).**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1999

Decided Aug. 1, 2000

---

* Ibolya Juliano, Mr. Juliano's wife, who was originally a plaintiff in this action, died during the course of the proceedings in the district court.

Charles B. Updike, Schoeman, Updike & Kaufman, LLP (Scott M. Riemer, of counsel), New York, NY, for Plaintiff–Appellant–Cross–Appellee.

Kenneth J. Kelly, Epstein Becker & Green, P.C. (Mark J. Goldberg, of counsel), New York, NY, for Defendant–Appellee–Cross–Appellant.

Mary Ellen Signorille and Melvin Radowitz, Washington, DC, for Amicus Curiae AARP.

Before: McLAUGHLIN, STRAUB, and SACK, Circuit Judges.

SACK, Circuit Judge:

This is an appeal and cross-appeal from a judgment entered by the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge;* Nicholas Tsoucalas, *Judge,* sitting by designation). The plaintiffs, Louis and Ibolya Juliano (the "Julianos"), brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, against The Health Maintenance Organization of New Jersey, doing business as U.S. Healthcare ("USH"), to recover medical benefits that allegedly were due to them and attorneys' fees that they incurred in the attempt to recover them. Mrs. Juliano suffered from multiple sclerosis. USH is a health maintenance organization ("HMO") as that term is used in the Health Maintenance Organization Act of 1973 (the "HMO Act"), 42 U.S.C. § 300e *et seq.* The district court granted partial summary judgment in favor of USH, concluding that the benefits to which the plaintiffs claimed they were entitled under their HMO contract with USH were not "medically necessary" and therefore USH was not obligated under the contract to provide them. The district court decided, however, that the Julianos were entitled to the "value" of the alternative benefits that USH had offered as of the date they satisfied the requirements for securing those benefits from USH. After a bench trial held to determine when the Julianos had perfected their right to the alternative benefits offered by USH, the district court found that the Julianos had perfected those rights twenty-nine days before Mrs. Juliano's death, and it therefore awarded Mr. Juliano twenty-nine days worth of benefits, which it valued at $24,360.

On appeal, Mr. Juliano argues that the district court erred in granting partial summary judgment in favor of USH and denying his attorneys' fees request. On its cross-appeal, USH contends that the district court erred in calculating the damage award by using the cost that USH would have incurred in providing the benefits it had offered rather than the actual cost to the Julianos of the care they obtained for Mrs. Juliano.

We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

At all times pertinent to this appeal, Mr. Juliano was a partner in the New York City law firm of Bigham Englar Jones & Houston. On January 1, 1993, the firm signed a Group Master Contract (the "Contract") with USH. Under the Contract, USH would provide health benefits to those firm employees who opted to become members of a plan governed thereby. On the same day, Mr. Juliano, for himself and his wife, elected to become a member of the "Patriot V HMO Plan" (the "Plan") provided pursuant to the Contract. Dr. Joseph A. Schwenkler, who had been Mrs. Juliano's principal physician since late 1987 and was a USH-approved primary care physician, was designated by the Julianos as Mrs. Juliano's primary care physician under the Plan. It is undisputed that the Contract qualifies as an employee welfare benefit plan under ERISA. *See* 29 U.S.C. § 1002(1).

In 1964, Mrs. Juliano was diagnosed as suffering from multiple sclerosis. Multiple sclerosis is a chronic disease that may be

caused by a failure of the immune system. Neurological deterioration is typical and often results in decreased function first in the lower extremities and then in the upper extremities.

By the early 1990's, Mrs. Juliano had become bedridden, quadriplegic, barely capable of speech, unable to eat, and without a "gag reflex" to enable her to swallow. When she was not in the hospital, she received twenty-four-hour-a-day, seven-day-a-week nursing care at home. The major challenge facing her care-givers was to keep her airway clear. Her nurses were required continually to place a "Yankaur suction" (essentially a long plastic catheter attached to a suction producing machine) in the back of her mouth and throat to remove and clear fluids.

Mrs. Juliano's source of food was nutrients delivered to her stomach through a gastrostomy tube. The tube and the area on her body surrounding its point of insertion required twice-daily cleaning. During feedings, Mrs. Juliano's nurses insured that the nutrients were being digested properly by checking her stomach contents every three hours or so. This was done by inserting a syringe into the feeding tube and "pulling" the secretions out to see how much feeding material remained in the stomach. Depending on the results of the sampling, the nurses would either continue the feeding or wait for further digestion.

A Foley catheter was employed to dispose of Mrs. Juliano's urine. It required thrice-daily cleaning and periodic checking to insure that her urine flow was adequate.

As a result of being bedridden, Mrs. Juliano developed a large decubitus (bedsore) on her hip that required regular cleansing to prevent infection. She had to be physically moved in bed every two hours to prevent the bedsore from worsening. For similar reasons, Mrs. Juliano was completely removed from bed at least three or four times a day with the use of a crane-like device. This task was made difficult by Mrs. Juliano's quadriplegia and by the fact that her legs were in splints because her leg bones had fractured from severe osteoporosis.

Mrs. Juliano succumbed to her disease on February 7, 1995, while this litigation was pending in the district court.

Shortly after becoming a USH member in January 1993, Mr. Juliano tried to secure coverage under the Contract for his wife's home care. Under the Julianos' prior healthcare plan, reimbursement of what Mr. Juliano told this Court was eighty percent of Mrs. Juliano's medical expenses was made "without incident." On January 5, 1993, less than a week after the inception of the Julianos' membership in the Plan, Mrs. Juliano's primary care physician, Dr. Schwenkler, wrote a letter to USH informing it that Mrs. Juliano "require[d] private duty nursing" and that he "strongly recommend[ed] that her present home-care be continued under her [USH] benefits." USH responded in a six-line letter to Dr. Schwenkler dated January 20, 1993, stating that the "request for private duty nursing is denied as this is not a covered benefit under the [USH] plan," but that Mrs. Juliano would be entitled to treatment at a skilled nursing facility and that such care could be arranged through USH's Patient Management division.

On February 5, 1993, in response to USH's letter, the benefits coordinator at Mr. Juliano's law firm wrote to USH asserting that the private duty nursing requested for Mrs. Juliano by Dr. Schwenkler was a covered benefit available under the Plan. Several days later, on February 8, Dr. Schwenkler wrote on his prescription pad that Mrs. Juliano "requires 24–hour around-the-clock nursing care." It appears to be undisputed that the note was delivered to USH.

On February 24, 1993, USH responded by letter to the February 5 letter from the law-firm benefits coordinator. USH did not claim that private duty nursing was not a covered benefit. It asserted instead that it had "determined . . . that the most cost-effective way of providing 24 hour

skilled nursing care is in a nursing facility as opposed to through home care" as requested. In a March 8 follow-up letter, USH said that it was not obligated to provide services in the home "simply because an enrollee requests them." It reiterated its position that "[i]f a choice can be made among severally [sic] medically appropriate alternative services or settings, medical case management may include consideration of whether a particular service or setting is cost-effective." Hence, USH offered Mrs. Juliano twenty-four hour nursing care in a skilled nursing facility.

The Julianos pursued their claim for home care through USH's grievance and appeal system. After an exchange of letters between USH and a lawyer retained by the Julianos, USH referred the matter to a "Grievance Review Committee." By letter dated May 12, 1993, USH reiterated its decision that it was not required to provide services in the Julianos' home upon their request and that it was within its discretion to offer Mrs. Juliano care in a nursing facility instead. On May 27, 1993, through counsel, the Julianos appealed the May 12 decision of the Grievance Review Committee to USH's Board of Directors. On June 28, 1993, rather than hearing from the Board, the Julianos received a letter from a representative of the Grievance Appeal Committee indicating that the Committee had performed a second review of Mrs. Juliano's claim, and had rejected it. USH reiterated that its reason for denying home care for Mrs. Juliano was that there was "a medically appropriate cost effective alternative ... available"—a skilled nursing facility—and that Mrs. Juliano was therefore not entitled to home care.

On July 23, 1993, the Julianos initiated a third appeal by means of a seven-page letter with eleven exhibits directed to the Executive Advisory Committee of USH. Receiving no response, on August 30, and then again on September 22, 1993, the Julianos sent letters to USH inquiring as to the status of the third appeal. In a letter coincidentally also dated September 22, 1993, USH tersely responded to the Julianos' July 23 letter, informing them that "since there is no further level of appeal, we will be unable to further review this case."

In the course of denying the benefits requested by the Julianos, neither the USH medical director responsible for Mrs. Juliano's case nor anyone else at USH conducted a physical examination of Mrs. Juliano despite the Julianos' request for one. Nor did anyone at USH review Mrs. Juliano's medical records, commission an independent medical report on her condition, or request an evaluation from a skilled nursing facility of Mrs. Juliano as a prospective patient. On December 28, 1993, the Julianos filed the complaint in this lawsuit in the United States District Court for the Southern District of New York. They alleged that Mrs. Juliano was entitled to private duty nursing provided at home under the USH Contract, and sought reimbursement for the past and prospective cost of Mrs. Juliano's private duty nursing. The Julianos also alleged that USH had violated statutory fiduciary duties to them. Finally, the Julianos sought reimbursement for their attorneys' fees pursuant to statute.

After completion of discovery, the Julianos and USH filed cross-motions for summary judgment. The district court requested letter briefs addressing the meaning of the term "medically necessary," which is used in the Contract to describe the conditions under which USH will provide covered "Home Health Services." The court also asked that Mrs. Juliano's primary care physician, Dr. Schwenkler, be made available for examination by the court. Dr. Schwenkler appeared and testified that he understood the term "medically necessary" to embrace "[t]reatments that are required by a patient because of their [sic] medical condition." The court asked Dr. Schwenkler, "Is home care medically nec-

essary for [Mrs. Juliano] as opposed to having those same medical services furnished in an institutional facility?" Dr. Schwenkler's response was "No."

The district court, from the bench, then rendered partial summary judgment in favor of USH. The court said that it was reviewing USH's denial of home-care benefits to Mrs. Juliano *de novo.* It concluded that the Contract provided for the provision of home care as an outpatient benefit and that under the Contract, in order for Mrs. Juliano to be entitled to an outpatient benefit, the benefit had to be "medically necessary." Even though lack of medical necessity was never proffered to the Julianos by USH as a reason for its refusing reimbursement for home care, the court held that the denial was justified because the "plaintiffs [had] not carried their burden of demonstrating that home care—as opposed to 24–hour care in a skilled nursing facility—is medically necessary." The district court declined to address at that time the unbriefed question of whether the Julianos were entitled to the money that USH would have spent on the nursing-facility care it had offered in place of home care but that the Julianos had never received because they had not permitted Mrs. Juliano to be removed from her home to a nursing facility.

After further supplemental briefing, the district court issued an order on October 31, 1996, granting further partial summary judgment in favor of USH. The court first rejected the Julianos' claim for equitable relief. It concluded that USH was under no obligation under ERISA to state in the Contract that if the Julianos opted not to accept the nursing-facility benefit that USH offered and to pursue their own course of home treatment instead, they would not be entitled to the cash value of the offered but unused nursing facility benefit.

The district court then held, on the basis of an extensive late 1994 and early 1995 search by Mr. Juliano for an appropriate nursing facility for Mrs. Juliano, that the

Julianos *might* be entitled, on a contract theory, to "recover benefits due [them] under the terms of [their] plan," i.e., reimbursement for the costs of the skilled nursing facility care offered by USH. But the court found itself unable on the record before it to grant summary judgment to either party on this question. It therefore ordered a trial limited to the issue of when, if ever, prior to Mrs. Juliano's death, the Julianos had satisfied the terms of the Contract so as to have become entitled to nursing facility benefits.

A bench trial on this issue was then held before Judge Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation. In his subsequent opinion and order, after expressing his disagreement with some of Judge Wood's findings by which he conceded he was nonetheless bound, Judge Tsoucalas held that in order to be entitled to nursing facility benefits under the Contract, the Julianos had to "(1) select [a skilled nursing facility] site from those suggested by [USH]; and (2) have [the primary care physician] examine Mrs. Juliano and provide a written referral of the patient for [skilled nursing facility] care." *Juliano v. Health Maintenance Organization of New Jersey, Inc.,* No. 93 Civ. 8960(NT), 1997 WL 83405, at *8, 1997 U.S. Dist. LEXIS 2046, at *23 (S.D.N.Y. Feb. 27, 1997). Although Mrs. Juliano never in fact moved to a nursing facility, the court found that Mr. Juliano had done all that was required for the Julianos to be entitled to nursing facility benefits by January 10, 1995, and that Mr. Juliano was therefore entitled to those benefits from that date until the date of Mrs. Juliano's death twenty-nine days later. *See* 1997 WL 83405, at *10–*11, 1997 U.S. Dist. LEXIS 2046, at *27–*29. Although the Julianos spent somewhere between $500 and $540 per day on the home care that Mrs. Juliano received during that period, the court found that the cost USH would have incurred to provide the appropriate care in a skilled nursing facility would have been at least $840 per day.

*See* 1997 WL 83405, at \*13, 1997 U.S. Dist. LEXIS 2046, at \*34–\*35. The court therefore entered an award of $24,360 ($840 per day for twenty-nine days) in favor of Mr. Juliano. *See id.*

Mr. Juliano thereafter moved for attorneys' fees under ERISA. In an order dated November 17, 1998, Judge Wood denied the motion on the grounds that the defendant had, in large measure, prevailed, and that it had not been shown to have acted in bad faith.

This appeal and cross-appeal followed.

## DISCUSSION

### I. Standard of Review

■ We review the district court's grant of partial summary judgment *de novo. See Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 163 (2d Cir.1999). Whether the court chose the correct method of calculating damages is a question of law, *see Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir. 1991), which we review *de novo, see Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045 (2d Cir.1991).

### II. Notification

ERISA contains a general requirement that an employee benefit plan, of which the parties agree the Contract is one, must

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. The nature of the information that must be given to a plan member upon a denial of benefits and the "full and fair review" to which the member is then entitled under this section have been developed through regulation. For example, 29 C.F.R. § 2560.503–1(f) states that when a claim for benefits is denied, written notice must provide "[t]he specific reason or reasons for the denial"; the "[s]pecific reference to pertinent plan provisions on which the denial is based"; "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"; and "[a]ppropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." The required review procedures are set forth in 29 C.F.R. § 2560.503–1(g).

The regulations go on to provide, however, that the provisions of § 2560.503–1 will be deemed met by a "Qualified Health Maintenance Organization," USH being one, if it complies with the provisions of the HMO Act, 42 U.S.C. § 300e in particular, and any regulations promulgated pursuant thereto. *See* 29 C.F.R. § 2560.503–1(j). Section 300e states that an HMO must "be organized in such a manner that provides [sic] meaningful procedures for hearing and resolving grievances between the health maintenance organization (including the medical group or groups and other health delivery entities providing health services for the organization) and the members of the organization." 42 U.S.C. § 300e(c)(5). Regulations under § 300e in turn provide that HMOs "must have and use meaningful procedures for hearing and resolving grievances between the HMO's enrollees and the HMO." 42 C.F.R. § 417.124(g). They must insure that "[g]rievances and complaints are transmitted in a timely manner to appropriate HMO decisionmaking levels that have authority to take corrective action," 42 C.F.R. § 417.124(g)(1) and that "[a]ppropriate action is taken promptly, including a full investigation if necessary and notification of concerned parties as to the results of the HMO's investigation," 42 C.F.R. § 417.124(g)(2).

■ Whether the provisions of 29 U.S.C. § 1133, 42 U.S.C. § 300e, or both apply, the underlying principle is the same: A member of an HMO is entitled to notice from the HMO of the reason for the denial of a benefit. There are at least two reasons for the requirement. First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. Second, if the HMO persists in its denial, notice can enable the member effectively to protest that decision. As the Eighth Circuit put it, "The purpose of [the 'full and fair review'] requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir.1999); *see also Richardson v. Central States, Southeast and Southwest Areas Pension Fund*, 645 F.2d 660 (8th Cir.1981)[1]; *cf. Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir.1998) ("We will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation."); *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997) ("In simple English, what [29 C.F.R. § 2560.503–1(f) ] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.").

### III. Failure of the Julianos To Establish "Medical Necessity"

The district court applied a *de novo* standard of review to USH's decision to deny the requested home care for Mrs. Juliano. *See generally Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir.1999) ("[T]he *de novo*

standard of review applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator.") Although the parties agree that *de novo* review was required, they disagree on the scope of that review.

Mr. Juliano argues that in the context of ERISA, *de novo* review means that the court addresses for itself the bases for the denial of benefits that the plan administrator communicated to the member and then decides whether it would have reached the same conclusions on those bases as did the administrator. USH's stated reason for declining to provide in-home care was that it "determined ... that the most cost-effective way of providing 24 hour skilled nursing care [was] in a nursing facility as opposed to through home care." Mr. Juliano contends that the district court was limited to making a determination as to whether the stated reason was a proper basis for denial of coverage. The district court could not affirm USH's decision as it did on the basis that home care was not "medically necessary," his argument continues, because that was a ground never asserted by USH as a basis for its decision to deny benefits.

■ We disagree. We do not think that USH's failure to mention medical necessity, the grounds on which the district court affirmed USH's refusal to reimburse the Julianos, in its communications to the Julianos, constituted a waiver or estoppel with respect to its use of lack of "medical necessity" as a defense in this lawsuit. The Julianos brought this action to establish that they were entitled under the Plan to be paid for Mrs. Juliano's home care. They were required to prove their case; to establish that they were entitled to that

[1] [T]he Trustees were obligated to set out in opinion form the rationale supporting their decision so that [the beneficiary] could adequately prepare himself for any further administrative review, as well as an appeal to the federal courts. The statute and the regulations were intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the Fund as a smoke screen to shield itself from legitimate claims.
*Richardson v. Central States, Southeast and Southwest Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir.1981).

benefit pursuant to the terms of the Contract or applicable federal law. *See Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658–59 (8th Cir.1992) (burden of proof is on ERISA plaintiff to establish medically necessity where it is prerequisite for entitlement to benefit); *cf. Terry v. Bayer Corp.,* 145 F.3d 28, 39 (1st Cir.1998) (mere procedural irregularities do not automatically entitle ERISA plaintiff to benefits); *Sedlack v. Braswell Servs. Group,* 134 F.3d 219, 225 (4th Cir.1998) (same). To be entitled to home care for Mrs. Juliano under the terms of the Contract, as the district court correctly held, Mr. Juliano was required to establish that the benefits sought were "medically necessary." [2] In response to USH's motion for summary judgment, Mr. Juliano did not elicit evidence sufficient to raise a triable issue of fact on that issue.

■ We are aware that under the law applicable to insurance policies, an insurer may be barred from raising defenses not asserted in communications to the insured denying coverage. *See, e.g., State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1431 (2d Cir.1991). We are reluctant to impose that rule in the case at bar.

■ First, even when insurance coverage is denied, "where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." *Albert J. Schiff Assocs., Inc. v. Flack,* 51 N.Y.2d 692, 698, 435 N.Y.S.2d 972, 975, 417 N.E.2d 84, 87 (1980). Medical necessity is required for the Julianos' reimbursement under the terms of the Contract and is therefore analogous to "the existence or nonexistence of coverage" of an insurance policy under insurance law.

Second, the notice provisions of ERISA are designed to spawn meaningful dialogues between plan administrators and plan members. If plan administrators lost the ability to assert in court reasons for declining coverage that were not asserted at the time reimbursement was declined, the notices would threaten to become meaningless catalogs of every conceivable reason that the cost in question might not be reimbursable, instead of candid statements as to why the administrator framing the notice thinks reimbursement is unwarranted. The result, we fear, would be the loss of some of the usefulness of these exchanges.

This is not to say that the failure of an HMO to specify in its notices the reason for denial of benefits is without consequence. An administrator's failure to inform a member of a reason for denial deprives the member of the ability to make a contrary case to the administrator. Because the Julianos were not told that they were being denied reimbursement for home care on the grounds that it was not "medically necessary," they cannot be faulted for having failed to provide USH with evidence of medical necessity while they were seeking USH's reconsideration of its denial. In performing *de novo* review, the district court therefore could not decide the case solely on the basis of the failure of the evidence in the administrative record compiled during the course of

---

2. The preamble to the outpatient benefits section of the Contract states, "[T]he following services will be provided to Members when medically necessary...." Home health services are listed as an outpatient benefit under the Contract. The Contract defines "Medically Necessary or Medical Necessity" as

[a]ppropriate and necessary services as defined by HMO which are rendered to a Member for a condition requiring, according to generally accepted principles of good medical practice, the diagnosis or direct care and treatment of an illness or injury

and which are not provided only as a convenience.

The Contract's definition of "medically necessary" therefore requires a showing that home services are appropriate and necessary services according to generally accepted principles of good medical practice and are not provided only as a convenience. This was essentially the inquiry that the district court engaged in at the December 2 hearing. The district court therefore applied the proper definition of "medically necessary."

the Julianos' appeal to USH to establish medical necessity.

■ We have said that "the decision [of the district court] whether to admit additional evidence [beyond that in the administrative record] is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." *DeFelice v. American Int'l Life Assurance Co. of New York,* 112 F.3d 61, 66 (2d Cir.1997). As a result of the failure of USH to state that absence of "medical necessity" was a reason for the denial of benefits in its notices to the Julianos, the district court acted well within its discretion in admitting additional evidence on that issue.[3]

■ When the Julianos failed to proffer evidence to establish the medical necessity of home care in opposition to USH's motion for summary judgment, however, the court, *sua sponte,* obtained evidence on the issue. Dr. Schwenkler was required to appear before the court. He testified that home care was *not* medically necessary. The methodology employed by the district court was unorthodox, to be sure. Live testimony before the court is not ordinarily part of the summary judgment process. But the effect of the procedure adopted by the district court in this case was to give the Julianos the *de novo* review as to whether home nursing care for Mrs. Juliano was "medically necessary" to which they were entitled. The district court correctly concluded that there was no triable issue of material fact on the issue and that USH was therefore entitled to summary judgment on the grounds that the Julianos had failed to establish that they were entitled to home

care for Mrs. Juliano under the terms of the Contract and Plan.

## IV. The Julianos' Rights under the HMO Act

### A. The HMO Act

The Contract states that it "shall be subject to amendment, modification or termination in accordance with any provision [t]hereof, by operation of law, by filing with and approval by applicable public authority, or by mutual written agreement between HMO and Contract Holder without the consent or concurrence of Members." According to its terms, the Contract "shall [also] be construed according to applicable state and federal law." The Julianos argued to the district court that USH had failed to comply with applicable federal law when it denied home-care benefits for Mrs. Juliano. The district court does not appear to have considered this argument when it granted partial summary judgment in USH's favor. In a later order, the district court mentioned only "the Contract" in deciding "that [USH] was not required to provide home health-care unless such care was medically necessary."

The HMO Act states, "A health maintenance organization shall provide, without limitations as to time or cost other than those prescribed by or under this subchapter,[4] basic ... health services to its members." 42 U.S.C. § 300e(b) (footnote added). The term "basic health services" is then defined by the HMO Act to include "home health services." *See id.* § 300e–1(1)(G). "Home health services," in turn, is defined to "mean[ ] health services provided at a member's home by health-care

---

**3.** We hold in section IV, below, that the district court may be *required* to hold a hearing on remand as to whether Dr. Schwenkler prescribed or directed home care and, if not, whether he would have done so had USH indicated that such a prescription or direction was necessary for reimbursement. This suggests that the district court's hearing as to whether home care was "medically necessary" may have been mandatory. Because, in

any event, the hearing with respect to medical necessity was held and was proper, we need not and do not decide whether it was.

**4.** The subchapter exception to the requirement deals with HMO members who are *Medicare* or *Medicaid* eligible and therefore is not applicable to this case.

personnel, as prescribed or directed by the responsible physician or other authority designated by the health maintenance organization." *Id.* § 300e–1(1).

The provisions of the Act are reinforced by a "Notice to Federally Qualified Health Maintenance Organizations" (the "Notice")[5] issued by the Department of Health and Human Services on October 31, 1991. It was intended to clarify an HMO's responsibility to provide home health services under the law. The Notice states that the HMO Act

> requires that federally-qualified HMOs provide "basic health services" to their members "without limitations as to time or cost [with certain exceptions not relevant here]." [42 U.S.C. § 300e(b)]. The law specifies that basic health services include "home health services." [42 U.S.C. § 300e–1(1)(G)]. The statute specifically defines home health services as "health services provided at a member's home by health care personnel, as prescribed or directed by the responsible physician or other authority designated by the [HMO]." [42 U.S.C. § 300e–1(1)].[6]

Later, the Notice discusses "Alternative Services and Alternative Settings":

> An HMO is not required to provide specific services in the home simply because an enrollee requests them. As discussed above, home health services are only those that are "prescribed or directed by the responsible physician or other authority designated by the [HMO]." If a basic health service may be provided in more than one medically appropriate setting, it is within the discretion of the physician or other appropriate authority designated by the HMO to choose the setting for providing the

care. HMOs are expected to exercise prudent medical case management to ensure that appropriate care is rendered in the appropriate setting.

 Applying the terms of the Notice to this case, USH was not required to provide home health care simply because the Julianos asked for it. Home health care services are only those that were "prescribed or directed" by Dr. Schwenkler. Even if the care that Mrs. Juliano needed could have been "provided in more than one medically appropriate setting," it was "within the discretion of" Dr. Schwenkler "to choose the setting for providing" that care.

The provisions of § 300e and the Notice thus raise two related questions, neither of which seems to have been addressed by the district court when it granted partial summary judgment for USH. First, on January 5, 1993, Dr. Schwenkler, the "responsible physician ... designated by USH," wrote to USH informing it that Mrs. Juliano "require[d] private duty nursing" and that he "strongly recommend[ed] that her present home-care be continued under her [USH] benefits." On February 8, Dr. Schwenkler wrote a note on his prescription pad that was later apparently conveyed to USH stating that Mrs. Juliano "requires 24–hour around-the-clock nursing care." Do those writings, in light of the other facts of this case, establish that Dr. Schwenkler "prescribed or directed" home care? If the answer is in the affirmative, then Mrs. Juliano was entitled to home care under the terms of 42 U.S.C. § 300e to the extent Dr. Schwenkler "prescribed or directed" it. This is a question that we think should be addressed by the

---

**5.** We need not address whether the Notice is an administrative agency interpretation of the HMO Act that is directly binding on HMOs or the courts because our decision is not dependent on a resolution of this issue. Moreover, Mr. Juliano has argued and accepted its applicability and USH has affirmed that it is bound by the terms of the Notice with regard to home health care.

**6.** The Notice states that
Regulations specify items that are not required to be provided as basic health ser-

vices. These include, for example, "custodial or domiciliary care," "long-term physical therapy and rehabilitation," and "durable medical equipment for home use (such as wheel chairs, surgical beds, respirators, [and] dialysis machines)." Regulations at 42 C.F.R. § 417.101(d). An HMO is not required to provide any of these excluded services or items under the rubric "home health services." (Alteration in original.)

district court in the first instance and we remand to allow it to do so.

 Second, as set forth in part II of this opinion, the notice and review principles of ERISA require that a plan member be given the ability and opportunity to respond effectively to an HMO's denial of benefits, which includes the ability to take whatever further action might be necessary to entitle him or her to the benefits in question. An HMO cannot be rewarded for successfully playing a game of "hide the ball" with its participants, as USH may have done with the Julianos. If the communications from USH to the Julianos did not inform them that USH denied home care to Mrs. Juliano because of a missing prescription or direction, and the district court finds that Dr. Schwenkler did not prescribe or direct home care, then Mr. Juliano must be permitted to submit evidence tending to establish that had the Julianos received such notice from USH, Dr. Schwenkler would have prescribed or directed home care.

On the current record, we cannot tell whether Dr. Schwenkler would have prescribed or directed home care for Mrs. Juliano or the extent to which he would have prescribed or directed it had he known that his issuance of a formal prescription or direction was significant. On the one hand, a doctor who "strongly recommend[ed] that [Mrs. Juliano's] . . . home-care be continued under her [USH] benefits" might well have prescribed or directed home care had he been asked at the time. On the other hand, Dr. Schwenkler testified that home care was *not* "medically necessary" for Mrs. Juliano "as opposed to having those same medical services furnished in an institutional facility." Perhaps, then, he would *not* have been willing to prescribe or direct such care. If the district court, on remand, holds that Dr. Schwenkler did not prescribe or direct home care, it must decide whether he would have done so had USH indicated that such a prescription or direction was called for. We therefore vacate the partial grant of summary judgment in favor of USH and remand for the

district court to receive evidence on and decide this issue, through further summary judgment proceedings or through trial.

We emphasize that the purpose of any such additional proceedings would be to put the Julianos in the position in which they would have been had USH's communications to the Julianos rejecting reimbursement for Mrs. Juliano's home nursing care explained that the reason for the rejection was the absence of a proper prescription or direction. Mr. Juliano would have the burden of establishing to the satisfaction of the trier of fact by a preponderance of the evidence that had such notification been given by USH to the Julianos, Mrs. Juliano's primary care physician would, at that time, have given such a prescription or direction. Something more than perfunctory testimony by a physician that he or she would have prescribed home care under those circumstances is required.

### B. The Notice and "Prudent Medical Case Management"

 Argument by the parties both here and before the district court focused on that part of the Notice that reads, "HMOs are expected to exercise prudent medical case management" in opting to provide Mrs. Juliano care in a skilled nursing facility rather than her home. The parties dispute whether USH exercised "prudent medical case management" when it decided it would provide Mrs. Juliano care in a skilled nursing facility but not in her home. We find this inquiry unhelpful.

First, the requirement that HMOs "exercise prudent medical case management to ensure that appropriate care is rendered in the appropriate setting" is complementary to, not in place of, the separately stated and repeated requirement that HMOs provide home health services "as prescribed or directed by the responsible physician." The sentence in the Notice preceding the one about "prudent medical case management" says, "If a basic health service may be provided in more than one medically appropriate setting, it is within the discretion of the [responsible] physician or other appropriate authority desig-

nated by the HMO to choose the setting for providing the care." We do not read the phrase "or other appropriate authority designated by the HMO" to give an HMO, having recognized a responsible physician with respect to the treatment of a patient (in this case Mrs. Juliano's USH-recognized primary care physician Dr. Schwenkler), the option to overrule at will the responsible physician if it disapproves of his or her prescription or direction.

Second, the "basic health service" to which Mr. Juliano asserts his wife was entitled is home care. We read the Notice to permit the HMO some discretion as to the place at which a service will be provided where a member requires a basic health service that can be provided at various types of locations, such as "physician services," *see* 42 U.S.C. § 300e–1(1)(A), which can be provided at home, at a doctor's office, at a hospital, or elsewhere. It is meaningless to discuss home care "in more than one medically appropriate setting." Home care takes place in the home. It may *not* "be provided in more than one medically appropriate setting."

Mrs. Juliano was entitled to home care to the extent it was or would have been prescribed or directed by Dr. Schwenkler.

## V. Equitable Relief

■ We reject Mr. Juliano's assertion that USH's procedural failures, to the extent there are any, entitle him to the *equitable* remedy of restitution, pursuant to 29 U.S.C. § 1132(a)(3)(B). "Restitution is an equitable remedy designed to restore to a plaintiff something of value that is wrongfully in the possession of another." *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores, Inc.*, 960 F.2d 1546, 1553 (11th Cir.1992). Thus, in order for Mr. Juliano to be entitled to restitution from USH for any benefits, he still must show that USH is wrongfully in possession of those funds; that is, that Mrs. Juliano's condition entitled her to those benefits under the terms of the Contract. He has not made such a showing, at least not yet.

## VI. Attorneys' Fees

■ The Julianos moved in the district court for attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). In light of the limited success of the Julianos in that court, the court did not abuse its discretion when it denied the motion. *See Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir.1987) (award of attorneys' fees under ERISA lies within discretion of district court). Because of our decision today to vacate and remand the grant of partial summary judgment to USH, however, we also vacate the district court's order with regard to attorneys' fees. The district court may consider a new motion for attorneys' fees based upon its conclusion on the merits on remand.

## VII. Damages

■ USH has cross-appealed the award of damages following the bench trial before Judge Tsoucalas. Although the district court granted summary judgment to USH as to the Julianos' claim that they were entitled to home-care benefits, the court held a bench trial to determine whether the Julianos had ever become entitled to the skilled nursing facility benefits for which USH said they were qualified but never in fact provided. If on remand Mr. Juliano establishes that Mrs. Juliano was entitled to home-care benefits, the issue of his entitlement to damages for the nursing facility care Mrs. Juliano did not receive may disappear. But if on remand Mr. Juliano is unable to establish that Mrs. Juliano was entitled to home-care benefits, the bench trial damage award would remain intact. Thus, in the interests of judicial economy, we address USH's fully briefed and argued contention on cross-appeal that the district court applied the wrong measure of damages.

After the bench trial, the district court concluded that as of January 10, 1995, the Julianos had fulfilled the requirements necessary under the Contract to receive

the skilled nursing facility benefits that USH had continuously offered and that they were therefore entitled to those benefits for the twenty-nine days that Mrs. Juliano remained alive after January 10. The court awarded Mr. Juliano $24,360 for those twenty-nine days, or $840 per day, the minimum the district court concluded it would have cost USH to provide the required care for Mrs. Juliano in a nursing facility. The award was made in the face of evidence that it cost the Julianos only between $500 and $540 to provide Mrs. Juliano with replacement home-care during those twenty-nine days. The district court's award was proper.

Mr. Juliano has a right under ERISA "to recover benefits due to him under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). If USH prevails on remand, it will be because the court has decided that the Julianos were entitled *only* to skilled nursing facility care. The district court meticulously calculated the cost of that care to be at least $840 per day, *Juliano*, 1997 WL 83405, at *11–*13, 1997 U.S. Dist. LEXIS 2046, at *30–*35, a number that USH does not dispute. If Mr. Juliano may recover the "benefits due to him under the terms of the plan" that were withheld from him, and if those benefits are valued at $840 per day, we see no reason why he should not recover $840 per day.

The result is rather strange. Mr. Juliano recovers more than the Julianos in fact spent on Mrs. Juliano's care during that period of time. But USH's behavior was rather strange. It insisted that Mrs. Juliano was entitled to receive, and that it would provide, only more expensive skilled nursing facility care when the Julianos wanted only less expensive, but generally equivalent, home nursing care. It ill behooves USH now to insist that the cost of the "benefits due ... under the terms of the plan" was the cost of the services that USH steadfastly refused to provide.

## CONCLUSION

For the foregoing reasons, the district court's judgment is vacated and the case remanded for further proceedings consistent with this opinion.