06-0343-cv
Krauss v. Oxford Health Plans, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: February 7, 2007          Decided: February 26, 2008)

Docket No. 06-0343-cv

--------------------------------------

Daniel J. Krauss and Geri S. Krauss,

Plaintiffs-Appellants,

- v -

Oxford Health Plans, Inc., Oxford Health Plans (NY), Inc. and
Oxford Health Insurance, Inc.,

Defendants-Appellees.

--------------------------------------

Before:    WALKER and SACK, Circuit Judges, and DANIELS, District
Judge.[*]

Plaintiffs, participants in one of defendants' health insurance plans, allege various violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., and the Women's Health and Cancer Rights Act, 29 U.S.C. § 1185(a). The United States District Court for the Southern District of New York (Colleen McMahon, Judge) granted summary judgment to the defendants. We, like the district court, conclude, inter alia, that the defendants did not violate either statute or the terms

_____

[*] The Honorable George B. Daniels, of the United States District Court for the Southern District of New York, sitting by designation.

of the insurance plan in declining to reimburse the plaintiffs (a) for more than $30,000 of Mrs. Krauss's $40,000 doctor's bill for bilateral breast reconstruction surgery where the maximum reimbursement for a single such surgery would have been $20,000, or (b) for private-duty nursing.

Affirmed.

GERI S. KRAUSS, Esq., New York, NY, Pro Se, for Plaintiffs-Appellees.[**]

PETER P. McNAMARA, Rivkin Radler LLP (Cheryl F. Korman, of counsel), Uniondale, NY, for Defendants-Appellants.

SACK, Circuit Judge:

The plaintiffs, Geri S. Krauss and Daniel J. Krauss, wife and husband, are members of an employer-provided health care plan that is governed by the provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"). The defendants, Oxford Health Plans, Inc., Oxford Health Plans (NY), Inc., and Oxford Health Insurance, Inc. (collectively, "Oxford"), administer claims for benefits under the plan.

In April 2003, Geri Krauss was diagnosed with breast cancer. Shortly thereafter, she underwent a double mastectomy and bilateral breast reconstruction surgery. The surgical procedures were performed in a single operative session by two different, unaffiliated doctors, neither of whom was a member of

---

[**] Mrs. Krauss, a member of the bar, is also acting as counsel for her husband Daniel and not pro se in that regard.

2

the plan's provider network. Following the operation, Mrs. Krauss received care from private-duty nurses. The Krausses paid for both the surgery and post-operative care themselves and sought reimbursement for those expenses from Oxford. Oxford refused payment for one-fourth of the cost of the breast reconstruction surgery and all expenses incurred for private-duty nursing.

After exhausting available administrative appeals, the Krausses filed this lawsuit in the United States District Court for the Southern District of New York. They allege that Oxford's denial of full reimbursement for the bilateral surgery and private-duty nursing care violated the Women's Health and Cancer Rights Act, 29 U.S.C. § 1185b ("WHCRA"), as well as various ERISA provisions. They further allege that Oxford violated ERISA by failing to make certain required disclosures and failing to respond to various grievances in the manner and time periods set forth by their plan.

Following cross-motions for summary judgment, the district court (Colleen McMahon, Judge) ruled in favor of Oxford on all claims. Krauss v. Oxford Health Plans, Inc., 418 F. Supp. 2d 416 (S.D.N.Y. 2005). Although we are not unsympathetic to the effects on the Krausses of the bureaucratic misadventures to which they were subjected by Oxford, we must, and do, nonetheless affirm.

## BACKGROUND

In April 2003, Mrs. Krauss was diagnosed with breast cancer. Her doctors, who were not members of Oxford's provider network, recommended that she undergo a double mastectomy and bilateral breast reconstruction,[1] to be performed in a single surgical session. On May 5, 2003, Oxford "pre-certified" (i.e., approved in advance) the breast-reconstruction portion of the surgery,[2] stating that "[p]ayment for approved services [would] be consistent with the terms, conditions, and limitations of [Mrs. Krauss's] Certificate of Coverage, the provider's contract, as well as with Oxford's administrative and payment policies." Letter from Patricia Robik to Geri Krauss dated May 5, 2003. On May 13, 2003, Mrs. Krauss underwent bilateral mastectomy and reconstruction surgery. Following the surgery, upon the doctors' suggestion and the plaintiffs' request, private-duty nurses oversaw Mrs. Krauss's recovery.[3]

---

[1]  According to Oxford's Rule 56.1 statement in the district court, "Oxford's written policy for Bilateral Surgery . . . states that 'Bilateral Surgery is defined by the Centers for Medicare and Medicaid Services . . . as procedures performed on both sides of the body during the same operative session or on the same day.'" Statement of Material Facts on Behalf of Defendants' Motion for Summary Judgment dated April 15, 2005, at 9, ¶ 46. The plaintiffs do not dispute this definition.

[2]  There is no dispute with respect to Oxford's reimbursement to the Krausses for doctors' charges for the double mastectomy.

[3]  Mrs. Krauss experienced two post-operative complications, one of which required emergency surgery nine days after the initial May 13, 2003 operation. The Krausses experienced some difficulty receiving payments for the emergency surgery, as well as for some other care that occurred thereafter. Reimbursement for care related to these services, however, was eventually provided, see Krauss, 418 F. Supp. 2d at 423, and therefore is

(continued...)

4

### Plaintiffs' Health Care Plan

The Krausses were at all relevant times participants in an ERISA-covered employee health insurance plan called the "Freedom Plan--Very High UCR" (the "Plan"). The Plan was established and sponsored by Mr. Krauss's employer, and claims for benefits under the Plan were administered by Oxford. The Plan's terms are set forth in three documents -- the Summary of Benefits, the Certificate of Coverage (for payment of physicians and other providers who were part of the Oxford network), and the Supplemental Certificate of Coverage ("Supplemental Certificate") (for out-of-network care). Because the Supplemental Certificate concerns the use of out-of-network providers including the surgeons who operated on Mrs. Krauss, it is the document of primary relevance for purposes of this appeal. A Plan member utilizing an out-of-network provider must herself pay a higher portion of her medical expenses from her own pocket than must a member receiving care from in-network providers.

Oxford limits its plans' costs for medical services by, inter alia, (1) restricting the services that the insurance plan covers; (2) imposing deductibles and coinsurance payments; and (3) paying medical expenses in accordance with a schedule of "usual, customary, and reasonable" ("UCR") fees for various medical services, Suppl. Certificate, Sec. I. ("How the Freedom Plan® Works"), subsec. 7. Charges in excess of the UCR rate or

---

[3](...continued)
not at issue on this appeal.

excluded from coverage by a plan, as well as the deductibles and coinsurance charges, are paid by the insured.

The Plan expressly excludes "[p]rivate or special duty nursing" from Plan coverage. Id. at Sec. IV ("Exclusions and Limitations"), ¶ 28. The Krausses had reached the Plan's annual limit on coinsurance and deductible charges at the time of Mrs. Krauss's surgery, so these charges did not reduce the amount of payments they received. They remained subject to the Plan's UCR schedule, however.

The Supplemental Certificate makes several references to the UCR schedule. The subsection entitled "Your Financial Obligations," for example, states:

> A UCR schedule is a compilation of maximum allowable charges for various medical services. They vary according to the type of provider and geographic location. Fee schedules are calculated using data compiled by the Health Insurance Association of America (HIAA)[4] and other recognized sources. What We [sic] Cover/reimburse is based on the UCR.

Id. at Sec. I, subsec. 7. Section XII, "Definitions," provides further that the UCR charge is "[t]he amount charged or the amount We [sic] determine to be the reasonable charge, whichever is less, for a particular Covered Service in the geographical area it is performed." Id. at Sec. XII.

According to the Supplemental Certificate, after Plan members receive care from an out-of-network provider, they must pay for services themselves and file a claim for reimbursement

---

[4] The HIAA now does business under the name Ingenix.

with Oxford.  Claims for services covered by the Plan are to be paid within sixty days of their receipt.

Plan members who wish to challenge the amount of their reimbursement may seek review through Oxford's grievance procedure.  Under that procedure, members' written grievances are first addressed by Oxford's "Issues Resolution Department" -- the "First-Level Appeal."  Members who remain dissatisfied may appeal to Oxford's "Grievance Review Board" -- the "Second-Level Appeal," and then to a committee appointed by the Board of Directors.  See Certificate of Coverage, Sec. VI.A; Letter from Celeste Vangilder to Geri Krauss dated Dec. 1, 2003, at 2.

Plaintiffs' Claims History

Dr. Mark Sultan charged the Krausses $40,000 for Mrs. Krauss's breast reconstruction procedure and $200 for a pre-operation consultation.  The private-duty nurses charged a total of $8,300 for her post-operative care.

The Krausses timely filed for reimbursement for both sets of services from Oxford.  In response, on June 13, 2003, they received a check from Oxford in the amount of $30,200 -- $30,000 for the double-breast reconstruction and the $200 consultation fee.  The accompanying Explanation of Benefits ("EOB") did not explain why the procedure was not fully reimbursed.  It stated only that the maximum allowable benefit was $30,200 and that "[t]his claim reflects industry standards for payment of services which include two surgical procedures."

7

EOB dated June 13, 2003, at 1. Oxford did not explain the absence of reimbursement for the private-duty nursing.

On November 10, 2003, the Krausses filed a grievance with Oxford for the $10,000 of Dr. Sultan's fee and for the $8,300 cost for private-duty nursing that had not been reimbursed. By letter dated December 1, 2003, Oxford denied the Krausses' grievance as to the bilateral reconstruction surgery fee, "as the cpt code 19364-50x1[5] was paid at the usual and customary rate, because we have participating providers performing the procedure effectively, and there is no medical reason as to why to grant [sic] an exception outside the UCR . . . ." Letter from Celeste Vangilder to Geri Krauss dated Dec. 1, 2003, at 1.

By letter dated December 3, 2003, Oxford notified the Krausses that it had referred the claim for the private-duty nursing care to its claims department. Oxford contends that it thereafter denied the Krausses' claim for private-duty nursing charges on the ground that private-duty nursing is not covered by the Plan, but the Krausses submit that they never received a report of Oxford's benefits determination in this regard.

---

[5] CPT is the commonly used abbreviation for "Current Procedural Terminology," a "system of terminology [that] is the most widely accepted medical nomenclature used to report medical procedures and services under public and private health insurance programs." American Medical Ass'n, CPT Process -- How a Code Becomes a Code, http://www.ama-assn.org/ama/pub/ category/3882.html (updated Oct. 30, 2007; last visited Feb. 25, 2008). CPT code 19364 is the code for "breast reconstruction with free flap." See Letter from Celeste Vangilder to Geri Krauss dated Dec. 1, 2003, at 1.

On December 9, 2003, the Krausses, in two letters, requested additional information in aid of filing their "Second-Level" appeal regarding the unpaid portion of Dr. Sultan's operating fee. Oxford responded with three additional cursory denial letters dated December 11, 2003, January 21, 2004, and January 22, 2004. These letters stated, respectively, that in-network providers could have performed the surgery and that "there is no medical reason . . . to grant an exception outside the UCR," Letter from Celeste Vangilder to Geri Krauss dated Dec. 11, 2003, at 1; that "[n]o additional payment will be forthcoming" because Oxford had determined the claim was paid "correctly at the [UCR]," Letter from Lorraine Paquette to Geri Krauss dated Jan. 21, 2004, at 1; and that, once again, "no additional payment [will] be forthcoming," this time because Oxford's "Medical Management Department confirmed that participating providers were available to treat your condition," Letter from Clarissa Rodriguez to Geri Krauss dated Jan. 22, 2004, at 1. Oxford did not respond to the Krausses' request for the details of the CPT code used, how the UCR was calculated, or on which Plan terms Oxford relied in denying their claim.

On January 26, 2004, the Krausses filed a Second-Level appeal with Oxford's Grievance Review Board, asserting, among other things, that Oxford had not complied with ERISA disclosure requirements. Some three weeks later, by letter dated February 19, 2004, Oxford acknowledged its receipt of the Krausses' December letters and enclosed various Oxford documents that

previously had not been disclosed to them, including its Bilateral Surgery Policy. This policy requires providers to identify bilateral procedures with the "modifier -50" attached to the standard billing code for the procedure at issue and indicates that procedures so identified would "be reimbursed at one and a half times the rate of the single procedure." Oxford "Bilateral Surgery Policy," effective July 14, 2003, at 1. The documents also disclosed that Oxford had sent Dr. Sultan, but not the Krausses, an EOB related to his operating fee for the bilateral breast reconstruction surgery that explained that the "full [UCR] allowance is provided for the primary procedure and 50% of the UCR amount is allowed for the subsequent procedure." Explanation of Benefits, June 13, 2003, at 1.

One week later, on February 26, 2004, the Krausses responded by letter contending that the Bilateral Surgery Policy was not set forth in their Plan's terms, had not been disclosed in Oxford's previous denial letters, violated state and federal laws requiring full compensation for post-mastectomy breast reconstruction, and had not been applied in other bilateral surgeries Geri Krauss had undergone.

By letter dated March 11, 2004, Oxford denied the Krausses' Second-Level appeal. Oxford asserted, for the first time, that the appropriate UCR under the Plan is "the level that 90% of all doctors (not 100% of all doctors) in the location would accept as full payment for the service," Letter from Karen Cofield to Geri Krauss dated Mar. 11, 2004, at 1, and that the

10

UCR for CPT code 19364-50 was $20,000, id. at 2.  The $30,000 reimbursement the Krausses received for the reconstruction surgery represented 150% of the UCR for a single reconstruction. The denial letter further stated that Oxford's Bilateral Surgery Policy was "consistent with well-established industry standards and in accordance with New York state insurance regulations," and was "not conceal[ed] . . . , but rather, [had been] publicize[d] . . . in its payment policies and on its explanations of benefits." Id. at 1-2.  Oxford further stated that its disclosures "far exceed[ed]" what ERISA requires, id. at 2, and that references in earlier letters to the availability of in-network providers referred to its understanding that the Krausses were requesting an "in-network exception," i.e., an exception to regular UCR rates that applies only if, unlike the procedure undergone by Mrs. Krauss, no in-network provider is available to perform it, id. at 3.

The ERISA Action

The Krausses responded to the denial of their administrative appeals by instituting this action.  Their complaint asserts claims for: (1) recovery of unpaid benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), on the grounds that Oxford's denial of benefits violated the WHCRA and the terms of the Plan; (2) breach of fiduciary duty in violation of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), on the grounds that Oxford failed to provide benefits owed to the Krausses and improperly handled their claims for reimbursement and their

11

appeals; (3) statutory damages under ERISA §§ 502(a)(3)(B)(1), (c)(1), 29 U.S.C. §§ 1132(a)(3)(B)(1), (c)(1), in light of Oxford's alleged failure to make timely disclosures and to provide accurate reasons for the denials of their claims; (4) a declaratory judgment barring the application of Oxford's Bilateral Surgery Policy to post-mastectomy breast reconstruction surgeries; and (5) costs and attorney's fees.

The parties filed cross-motions for summary judgment. The district court granted Oxford's motion in all respects and denied the plaintiffs'. It concluded that the Bilateral Surgery Policy did not violate either the WHCRA or the terms of the Plan, Krauss, 418 F. Supp. 2d at 416, 425-32, and that the Krausses could not recover the costs of the private-duty nurses because private-duty nursing is expressly excluded from Plan coverage, id. at 432-33. As for the Krausses' breach of fiduciary duty claim, the court determined that insofar as it was a demand for unpaid benefits, it was nothing more than a re-assertion of their claims for statutory damages. Id. at 433. The district court further concluded that ERISA's statutory disclosure requirements did not apply because Oxford was a claims administrator with respect to the Krausses' claims, not a plan administrator. Id. at 434. It also denied the request for an award of legal fees.

This appeal followed.

**DISCUSSION**

I. Standard of Review of the
   District Court's Determination

12

"We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007).

## II.  Claims for Unpaid Benefits

ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a participant or beneficiary of an ERISA-covered benefits plan to bring a civil action "to recover benefits due to him under the terms of his plan," id.  The Krausses seek recovery of the unpaid portion of Dr. Sultan's breast reconstruction surgery fee and the costs of private-duty nursing care, benefits they say were owed to them either under the WHCRA or the terms of the Plan.

As a threshold matter, the Krausses argue that the district court erred in reviewing Oxford's benefits determination and their arguments with respect thereto under the arbitrary and capricious standard.  Because Oxford's UCR benefit determination was not discretionary, they say, the court's review should have been de novo.  On the merits, the Krausses contend (1) that Oxford's application of its Bilateral Surgery Policy to Mrs. Krauss's breast reconstruction surgery and its refusal to reimburse them for the costs of post-operative private-duty nursing care violate the terms of the WHCRA; (2) that even if the Bilateral Surgery Policy complies with the WHCRA, its application to the Krausses violates the terms of the Plan: it is not a UCR

13

determination; was not properly disclosed; and was based upon an underlying HIAA-based UCR figure derived from a sample size too small to be meaningful; and (3) that the refusal to reimburse the costs incurred for private-duty nursing was contrary to the Plan's terms because the service was medically necessary and within the Plan's description of what it covers under the WHCRA.

A.  Standard of Review of Oxford's Actions

"[A] denial of benefits challenged under [ERISA § 502(a)(1)(B)] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard.  Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002).  Ambiguities are construed in favor of the plan beneficiary.  Id.

> A reservation of discretion need not actually use the words "discretion" or "deference" to be effective, but it must be clear.  Examples of such clear language include authorization to "resolve all disputes and ambiguities," or make benefits determinations "in our judgment."  In general, language that establishes an objective standard does not reserve discretion, while language that establishes a subjective standard does.

Nichols v. Prudential Ins. Co. of America, 406 F.3d 98, 108 (2d Cir. 2005) (quoting Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251 (2d Cir. 1999)).

14

We agree with the district court that the Plan conferred discretionary authority on Oxford to make benefits determinations. Two clauses within the Plan's Supplemental Certificate governing care provided by out-of-network providers are relevant. The first appears under the heading "General Provisions" and states that Oxford "may adopt reasonable policies, procedures, rules, and interpretations to promote the orderly and efficient administration of this Certificate . . . ." Suppl. Certificate, Sec. XI ("General Provisions"), ¶ 10. The second is within the definition of UCR charges itself. It states that the UCR charge is either "[t]he amount charged or the amount We [sic] determine to be the reasonable charge, whichever is less . . . ." Id. Sec. XII ("Definitions").

Despite a lack of clarity in our precedents as to what language conveys sufficient discretion to an administrator to require courts' "arbitrary and capricious" rather than de novo review of its actions, we conclude that the quoted language of the Oxford Plan does so.[6] The ability to "adopt reasonable policies, procedures, rules and interpretations to promote" the administration of a Certificate of Coverage has been cited as an example of the requisite discretionary authority by the Fourth Circuit, see Feder v. Paul Revere Life Ins. Co., 228 F.3d 518,

_____

[6] "[A]ppellate judges are divided on the issue of what language suffices to convey to plan administrators the discretionary authority that warrants the more deferential arbitrary and capricious standard of review." Kinstler, 181 F.3d at 251. As a result, circuits have offered different conclusions regarding the discretionary authority conveyed by the same or similar statutory language. Id. (citing examples).

15

523 (4th Cir. 2000) (citing Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995)). It also seems to us akin to authority to "resolve all disputes and ambiguities relating to the interpretation" of a benefits plan, language that we have previously characterized as sufficient to trigger arbitrary and capricious, rather than de novo, review. Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan, 76 F.3d 462, 466 (2d Cir. 1996).

Moreover, Oxford's UCR definition, which provides that the UCR charge is the lesser of the amount charged or the amount Oxford "determine[s] to be the reasonable charge," confers upon Oxford discretionary authority regarding one of the Plan terms here at issue: UCR charges. To be sure, our opinions regarding the bestowal of discretion by use of the verb "determine" provide little guidance. Compare Fay, 287 F.3d at 104 (concluding that the benefit plan there considered "invoke[d] discretion by defining 'Medically Necessary' as those services which, 'as determined by [the] . . . Medical Director,' meet four listed requirements" (emphasis in original) (second alteration in original) (quoting benefits plan)), with Nichols, 406 F.3d at 108-09 (finding, without citation to Fay, that plan language to the effect that a disability "exists when [the insurer] determines that" each of several specified conditions was met did not confer discretionary authority because the language required that the insurer's decisionmaking power be constrained by "objective standards"). But we think that where, as here, the terms of a benefits plan grant the defendant the right to

16

"determine" what constitutes a "reasonable charge," and the only source that might bear on what is reasonable is "data compiled by [HIAA] and other recognized [but unspecified] sources," Suppl. Certificate, Sec. I, subsec. 7 ("Your Financial Obligations"), the Plan confers discretion to determine which sources to rely upon in determining the UCR charge in any given circumstance.

Oxford exercised that discretion in applying the Bilateral Surgery Policy to the Krausses' claim for benefits related to Dr. Sultan's fee. Accordingly, we will decide whether doing so was arbitrary or capricious, that is, if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."[7] Fay, 287 F.3d at 104 (internal quotation marks and citations omitted); see also Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) ("Substantial evidence . . . is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires

---

[7] The Krausses' additional arguments for de novo review are without merit. To contend that Oxford's application of the Bilateral Surgery Policy was not a discretionary decision because it simply "mechanically applied a formula," Appellants' Br. at 53, ignores the fact that the decision to enact the Bilateral Surgery Policy was itself a discretionary decision in the first instance. And the fact that the New York State Insurance Department at one time concluded that the use of discretionary clauses "encourage misrepresentation or are unjust, unfair, inequitable, misleading, deceptive, or contrary to law or to the public policy" of New York, see Circular Letter No. 8 (2006), Mar. 27, 2006, available at http://www.ins.state. ny.us/cl06_08.htm (last visited Jan. 4, 2008), is irrelevant -- that conclusion was later withdrawn, id., and the proposed regulations would not apply retroactively to the Krausses' claims, see Circular Letter No. 14 (2006), June 29, 2006, available at http://www.ins.state.ny.us/cl06_14.htm (last visited Feb. 25, 2008).

17

more than a scintilla but less than a preponderance." (internal quotation marks and citations omitted)).

Separately, the Krausses' challenge under the WHCRA, see section II.B., below, raises questions of law which we review de novo. See Miller, 72 F.3d at 1072 (benefits determination is arbitrary and capricious if it is legally erroneous).

With respect to the Krausses' claim for reimbursement for private-duty nursing care, however, we assume, viewing the facts in the light most favorable to them as we must, that Oxford failed to inform them regarding the benefits determination made with respect to the nurses. We previously concluded, based on since-revised regulations, that failure to respond to a plan participant's claim within the time-frame established by the Department of Labor's regulations rendered the claim "deemed denied" and the participant's subsequent ERISA challenge to the benefits determination subject to de novo review. See Nichols, 406 F.3d at 105, 109 (relying on 29 C.F.R. § 2560.503-1(h)(4) (1999)). Although amended regulations have replaced the "deemed denied" provision with one that, upon a defendant's failure to follow regulatory time frames, deems a plaintiff's administrative remedies exhausted, see 29 C.F.R. § 2560.503-1(l), and neither we nor any other circuit has, to our knowledge, addressed whether de novo review similarly applies under the revised regulations, we join our sister circuits in delaying resolution of the question for another day. See Bard v. Boston Shipping Ass'n, 471 F.3d 229, 236 (1st Cir. 2006); Gatti v. Reliance Std. Life Ins. Co.,

18

415 F.3d 978, 982 n.1 (9th Cir. 2005); <u>Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan</u>, 379 F.3d 1168, 1175 n.6 (10th Cir. 2004). For the reasons stated below, even assuming a <u>de novo</u> standard of review applies, we would deny the Krausses' claim for compensation for the private-duty nursing care under ERISA section 502(a)(1)(B).

B. The WHCRA

1. <u>Dr. Sultan's Fees.</u> The Krausses contend that under the WHCRA, the Plan was obligated to provide full reimbursement to them for Dr. Sultan's fee for Mrs. Krauss's bilateral reconstructive surgery. They also argue that the WHCRA requires reimbursement of the costs associated with the private-duty nursing care provided to her because it was pursuant to a medical decision made by her physician regarding the "manner" in which her breast reconstruction surgery would be carried out.

The WHCRA provides, in relevant part, that a group health plan that provides insurance coverage for mastectomies must also provide coverage for a subsequent breast reconstruction surgery:

> (a) In general. A group health plan . . . shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for --
>
>> (1) all stages of reconstruction of the breast on which the mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient. <u>Such coverage may be subject to annual</u>

19

> deductibles and coinsurance provisions
> as may be deemed appropriate and as are
> consistent with those established for
> other benefits under the plan or
> coverage. . . .
>
> . . . .
>
> (d) Rule of construction. Nothing in this
> section shall be construed to prevent a group
> health plan or a health insurance issuer
> offering group health insurance coverage from
> negotiating the level and type of
> reimbursement with a provider for care
> provided in accordance with this section.

29 U.S.C. § 1185b (emphasis added).

As to their claim for reimbursement of Dr. Sultan's fee, the gist of the Krausses' arguments is that the statutory language providing that insurers may limit their coverage by requiring "annual deductibles and coinsurance" precludes insurers from applying any other "cost-sharing" mechanisms that would render plan participants responsible for a portion of the procedure's costs. Because the statutory language of similar legislation provides explicitly for the use of other "cost-sharing" mechanisms in addition to deductibles and coinsurance, they insist, the statutory maxim expressio unius est exclusio alterious ("to express one thing is to exclude another") applies: Congress, by omitting the term "cost-sharing" from the WHCRA, must have intended to preclude insurers from imposing cost-sharing mechanisms, such as the UCR-limited reimbursement at issue here, to post-mastectomy breast reconstruction surgeries.

We agree with Oxford, however, that the WHCRA requires only that insurers "cover[]" such surgeries in a manner

20

"consistent" with the policies "established for other benefits under the plan."  29 U.S.C. § 1185b(a).  "[T]he canon that expressing one item of a commonly associated group or series excludes another left unmentioned is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives." United States v. Vonn, 535 U.S. 55, 65 (2002).  "The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand . . . ." Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81 (2002).

Here, the Krausses cite the Newborns' and Mothers' Health Protection Act and the Mental Health Parity Act, Pub. L. No. 104-204, §§ 601-606, 701-703, 110 Stat. 2874, 2935-50 (1996) (codified at 29 U.S.C. §§ 1185-1185a), in support of their contention that Congress intended under the WHCRA to preclude insurers from imposing cost-sharing mechanisms apart from deductibles and coinsurance.  These two provisions contain "Rule of Construction" subsections that specifically refer to "cost-sharing," whereas the WHCRA refers only to "annual deductibles and coinsurance provisions," without reference to other cost-sharing devices.

The Newborns' and Mothers' Health Protection Act provides that "deductibles, coinsurance, or other cost-sharing" mechanisms are permissible so long as the mechanism imposed is not "greater than such coinsurance or cost-sharing" required for

21

the portion of a newborn's or mother's hospital stay following birth that would have been covered regardless of the Act's provisions. 29 U.S.C. § 1185(c)(3) ("Nothing in this section shall be construed as preventing a group health plan or issuer from imposing deductibles, coinsurance, or other cost-sharing in relation to benefits . . . except that such coinsurance or other cost-sharing . . . may not be greater than such coinsurance or cost-sharing for any preceding portion of [the hospital] stay."). The Mental Health Parity Act, in turn, references "cost sharing, limits on numbers of visits or days of coverage, and requirements relating to medical necessity" as examples of "the terms and conditions . . . relating to the amount, duration, or scope of mental health benefits," which the Act, Congress said, should not be construed as "affecting." Id. § 1185a(b)(2) ("Nothing in this section shall be construed . . . as affecting the terms and conditions (including cost-sharing, limits on numbers of visits or days of coverage, and requirements relating to medical necessity) relating to the amount, duration, or scope of mental health benefits under the plan or coverage . . . ."). Similarly, the WHCRA refers to "annual deductibles and coinsurance provisions" that "may" be imposed so long as they are "consistent with those established for other benefits under the plan or coverage." Id. § 1185b(a). The WHCRA further provides that the Act should not be interpreted to preclude health plans from negotiating with providers regarding the "level and type of

22

reimbursement . . . for care provided in accordance with [the WHCRA]." Id. § 1185b(d).

These provisions are plainly not an "associated group or series" that would be "understood to go hand in hand," such that "it is fair to suppose that Congress considered the unnamed possibility [of other cost-sharing mechanisms] and meant to say no to it." Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003) (internal quotation marks and citations omitted); see also id. (stating that the series must warrant "the inference that items not mentioned were excluded by deliberate choice, not inadvertence"). Each of the subsections the Krausses cite does no more than use similar language to express essentially the same idea: that the three statutory provisions -- which create a substantive floor for three different types of coverage -- should not be construed to create specific rules regarding the means by which the statutorily mandated categories of services are provided or to permit insurers to impose upon plan beneficiaries additional cost-sharing responsibilities beyond what their plan already requires for similar benefits.

The legislative history of the WHCRA supports our understanding that Congress's reference to "annual deductibles and coinsurance" was intended to be illustrative, rather than exclusionary. The relevant pages of the Congressional Record do not mention the words "cost-sharing," "deductible," or "coinsurance." See 144 Cong. Rec. S.4644-50 (1998). Congress enacted the legislation to ensure that women who underwent

23

mastectomies would not be denied coverage for reconstructive surgery on the ground that it was cosmetic. Id. at S.4644, 4650.

The Krausses point to the stated Congressional goal of making women "complete" and "whole" following their mastectomies, see id. at S.4649, and argue that this statutory purpose supports interpreting the statutory provision for deductibles and coinsurance to preclude other cost-sharing devices. We do not think that this legislative goal forecloses cost-sharing consistent with other terms of a plan. Congress was plainly focused on the question of coverage vel non; it was not concerned with the precise details of the coverage to be provided. As the district court noted, Congress surely did not contemplate that "restor[ing] a woman's wholeness," id., required insurers to cover 100 percent of the amount billed by the surgeon -- whatever that might be -- less only any applicable deductions and coinsurance provisions, regardless of the other terms and conditions of a plan. Krauss, 418 F. Supp. 2d at 427. The district court succinctly captured the fundamental illogic of the Krausses' argument: "Nothing in the legislative history affirmatively indicates that the insurer must offer better coverage for breast reconstruction than it offers for the mastectomies that necessitate them . . . . [I]t defies logic to assume that Congress would have imposed such a requirement sub silentio, or by negative inference." Id. at 426.

In sum, the WHCRA includes an express statement of permission as to deductibles and coinsurance and is silent as to

24

other cost-sharing possibilities; each of the three similar statutory provisions includes analogous language to ensure that insurers apply the same devices to control costs of mandated benefits that they employ for benefits unrelated to the statutory provisions, but only sometimes uses the inclusive term "cost-sharing"; and the legislative history of the WHCRA is silent regarding the entire concept of insurer-instituted cost control mechanisms. Under these circumstances, we cannot conclude that Congress, in failing to provide explicit permission for insurers to use other "cost-sharing" devices besides deductibles and coinsurance when providing "coverage" for breast reconstruction surgery, intended to limit permissible cost-sharing mechanisms to the two specifically mentioned. Oxford's application of UCR limits and, specifically, the Bilateral Surgery Policy, to Mrs. Krauss's surgery therefore did not violate the WHCRA.

2. Private-Duty Nursing. Parallel reasoning applies to the Krausses' claim under the WHCRA for reimbursement for private-duty nursing care. We see nothing in the statute to support a reading that requires an insurer to pay for private-duty nurses where such services are not otherwise covered and where post-operative care in a different form could have satisfied the patient's medical needs as identified by her doctor. That the WHCRA requires coverage for "all stages of reconstruction of the breast on which the mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient," 29 U.S.C. § 1285b(a)(1),

25

does not, we think, categorically override every plan's specific exclusion of private-duty nursing care in these circumstances. See Suppl. Certificate, Sec. IV ("Exclusions and Limitations"), ¶ 28. We cannot reconcile such an interpretation with the WHCRA's focus upon ensuring that breast reconstruction surgeries are covered co-extensively with other surgeries under a beneficiary's plan.

C.  The Plan's Terms

The Krausses next argue that application of the Bilateral Surgery Policy to their claim for reimbursement for the reconstruction surgery and the denial of any reimbursement for the private-duty nursing care violated the terms of the Plan. They contend that the Bilateral Surgery Policy is not a UCR determination, was not properly disclosed, and was derived from an underlying HIAA-based UCR figure that was unreliable. They further assert that the private-duty nursing care was a service "related" to the reconstruction surgery that came within Oxford's pre-certification of the procedure. We conclude, however, that Oxford's decision to apply the Bilateral Surgery Policy is supported by substantial evidence, and that even under de novo review, the explicit exclusion of private-duty nursing care by the Plan governs the Krausses' claims.

1. Bilateral Surgery Policy. We find the Krausses' assertion that the Bilateral Surgery Policy violates the Plan's terms to be meritless, largely because it fails to give effect to the breadth of Oxford's UCR definition and description contained

26

in the Supplemental Certificate.  In Section I, paragraph 7, the Supplemental Certificate states that UCR fee schedules are calculated by "using data compiled by the [HIAA] and other recognized sources," Suppl. Certificate, Sec. I, subsec. 7 (emphasis added).  Its "definition" of "UCR" accords Oxford the discretion to employ an amount it deems "reasonable . . . for a particular Covered Service in the geographical area it is performed."  Id., Sec. XII ("Definitions").  Nothing in the Plan's terms forbids Oxford from adopting a UCR based not only on HIAA data, but on some other "recognized" source.[8]

The Bilateral Surgery Policy, while arguably less than generous, comports with, and is based upon, Medicare's policy. See Medicare Part B Reference Manual § 22.1(e)(1), at 22-8 (2006), available at http://www.highmarkmedicareservices.com /partb/refman/pdf/chapter22.pdf (last visited Feb. 25, 2008) ("Payment for claims reporting bilateral procedures will be based on 150% of the fee schedule amount."); Certification of David H. Finley, M.D., ¶ 18 ("Oxford's Bilateral Surgery policy is based upon healthcare industry standards, customs, and practices, including the policies established by Medicare.").  The reimbursement rate of 150% of UCR was based, therefore, on both HIAA data and a "recognized source" (Medicare).  That the Bilateral Surgery Policy describes HIAA data as "the UCR," does not, we think, preclude Oxford from treating the Bilateral

---

[8]  The Krausses do not challenge Oxford's decision to rely on HIAA data as a general matter.  We therefore assume for purposes of this opinion that such reliance was proper.

27

Surgery Policy as having determined the Krausses' UCR in this instance. Of course, Oxford and its members would likely benefit from greater precision and less self-referential language in Oxford's references to what constitutes "the UCR," see, e.g., Letter from Karen Cofield, Grievance Associate, Oxford Health Plans, to Geri Krauss dated Mar. 11, 2004, at 1 (referring to amount paid under Bilateral Surgery Policy as "the UCR" and to the HIAA-derived payment level and application of the Bilateral Surgery Policy thereto as "150% of the UCR"). But because the terms of the Supplemental Certificate indicate that Oxford did not intend the UCR charge necessarily to be equivalent to the HIAA amount, and because we, like the district court, are unprepared to conclude that Medicare's policy is arbitrary and capricious, Krauss, 418 F. Supp. 2d at 428, we cannot conclude that Oxford's decision to apply the Bilateral Surgery Policy to determine the "reasonable" charge for Mrs. Krauss's surgery was an arbitrary or capricious application of the Plan.

There is also an insufficient basis for questioning Oxford's determination of what specific reimbursement rate applied to the Krausses' claim under the Bilateral Surgery Policy. Although the underlying HIAA-derived reimbursement rate of $20,000 for a single breast reconstruction was based on only ten comparable procedures, the Krausses do not challenge that the ten-procedure sample used to arrive at the $20,000 rate was based upon doctors' charges in Manhattan for the specific type of breast reconstruction surgery Mrs. Krauss underwent or that

28

Oxford derived the $20,000 amount from HIAA data, "Surgical Prevailing Healthcare Charges System, 11/10/01-11/09/02," a standard industry source. See, e.g., N.J. Admin. Code § 11:21-7.13(a) (defining "reasonable and customary" charges for small business health plans as "a standard based on the Prevailing Healthcare Charges System profile for New Jersey or other state when services or supplies are provided in such state, incorporated herein by reference published and available from . . . Ingenix, Inc. . . . "). Moreover, that Dr. Sultan received varying reimbursement amounts from Oxford for the same procedure performed on other patients during the period Mrs. Krauss underwent her reconstruction surgery does not demonstrate arbitrariness by Oxford in determining its reimbursement rate. The Plan entitled the Krausses to reimbursement at the equivalent of "90th percentile HIAA data." Letter from Karen Cofield to Geri Krauss dated Mar. 11, 2004, at 3. The record does not reveal what percentile applied to the benefit plans of Dr. Sultan's other patients.

2. Private-Duty Nursing. Oxford's decision not to reimburse the Krausses for the costs of private-duty nursing care following the reconstruction surgery also did not violate the Plan. Reviewing de novo the Krausses' claim under the contract for compensation, we agree with the district court that the Plan's explicit and unambiguous exclusion of "[p]rivate or special duty nursing" from coverage, Suppl. Certificate, Sec. IV ("Exclusions and Limitations"), ¶ 28, controls. The fact that

29

Oxford pre-certified Mrs. Krauss's surgery knowing that it would require post-operative care, or that it characterized the WHCRA as requiring it to "cover reconstructive surgery or related services following a mastectomy," does not obligate Oxford, contractually or otherwise, to pay for post-operative care or services "related" to Mrs. Krauss's operation by any and all means -- certainly not by a method of care expressly excluded from coverage under the Plan.[9]

We do not mean to imply that Mrs. Krauss should not have opted for the type of post-operative care that she and her doctor thought would be the most effective. We are sympathetic to the Krausses' arguments that post-operative care was required, and that Dr. Sultan recommended that the care be provided in the form of private-duty nursing. We also find some merit in their contention that private-duty nurses may have been more cost effective than similar care to which she would have been entitled had she been treated in the hospital's intensive care unit instead. But we think the Krausses' health care plan was amply

---

[9] Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279 (2d Cir. 2000) and Miller v. United Welfare Fund, 72 F.3d 1066 (2d Cir. 1995), upon which the Krausses rely, are not to the contrary. Neither case concerned benefit plans which excluded private-duty nursing from coverage. Juliano, 221 F.3d at 283 ("USH did not claim that private duty nursing was not a covered benefit."); Miller, 72 F.3d at 1070 (insurer denied benefits for private-duty nursing on grounds that it was not medically necessary). The Krausses here do not deny that Mrs. Krauss's post-operative medical needs could have been met had she stayed in an ICU. See Appellants' Br. at 51 ("[E]xclusion is not justified merely because Dr. Sultan required [post-operative] monitoring be done by specially trained private nurses rather than in the ICU, especially since he believed that to be the less expensive alternative." (emphasis omitted)).

clear that the nursing care she chose was not covered. The Krausses are, in these circumstances, bound by the terms of their contract. On these facts, Oxford was under no obligation to reimburse the Krausses for costs associated with the private-duty nursing care she received.

### III. Claims for Breach of Fiduciary Duty

The Krausses also bring a claim for breach of fiduciary duty pursuant to ERISA § 502(a)(3), which authorizes a civil action

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Specifically, the Krausses assert that Oxford breached that duty by failing to disclose certain information, by making false and affirmative misrepresentations regarding the true reason for denying their claims for reimbursement, and by failing to act on the Krausses' claims and appeals in a timely manner.

We have held that when an ERISA fiduciary deals unfairly with a plan's beneficiaries, a claim for breach of fiduciary duty may lie under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). See Frommert v. Conkright, 433 F.3d 254, 269-72 (2d Cir. 2006); Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88-89 (2d Cir. 2001), cert. denied, 537 U.S. 1170

31

(2003).  Here, however, we conclude that the Krausses are not entitled to relief.

First, the Krausses cannot recover money damages through their claim for breach of fiduciary duty.  In order to state a claim under ERISA section 502(a)(3), "the type of relief a plaintiff requests must . . . be 'equitable.'"  Coan v. Kaufman, 457 F.3d 250, 264 (2d Cir. 2006).  Claims for money damages are therefore not cognizable under section 502(a)(3).  Id. at 263-64; see also Gerosa v. Savasta & Co., 329 F.3d 317, 321 (2d Cir.), cert. denied, 540 U.S. 967 (2003).

Second, in arguing that Oxford mishandled their claim through nondisclosure, misleading statements, and untimely responses, the Krausses are in essence claiming that Oxford denied them the full and fair review to which they were entitled under ERISA § 503(2), 29 U.S.C. § 1133(2).[10]  A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review.  See Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993); VanderKlok v. Provident Life & Accident Ins. Co., 956 F.2d 610, 616-17 (6th Cir. 1992); Wolfe v. J.C. Penney Co., 710 F.2d 388, 393- 94 (7th Cir. 1983).  Here, however, now that the relevant information has been finally disclosed, we are confident that administrative remand would be futile.  See Miller, 72 F.3d

[10] Section 503(2) provides that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).

32

at 1071 (ERISA remand not required where it would be a "useless formality" (internal quotation marks and citations omitted)). Oxford's benefits determination, even if not properly explained at the time of denial and during administrative review, was, as a substantive matter, an appropriate implementation of the Bilateral Surgery Policy under the Plan. We therefore conclude that the Krausses are not entitled to relief for breach of fiduciary duty.

### IV. Remaining Claims

The Krausses make several other claims. We find them each to be without merit.

### A. Statutory Damages

We agree with the district court, Krauss, 418 F. Supp. 2d at 434, that since Oxford is not "the person specifically so designated by the terms of the instrument under which the plan is operated," 29 U.S.C. § 1002(16)(A)(I), it is not a plan "administrator" within the meaning of ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1). The Krausses therefore cannot recover statutory damages under that provision of ERISA for Oxford's nondisclosure of certain information. See Lee v. Burkhart, 991 F.2d 1004, 1010 n.5 (2d Cir. 1993); Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1138 (D.C. Cir. 1989).

### B. Declaratory Relief

For substantially the same reasons that we reject the Krausses' claims for unpaid benefits and damages relating to

33

Oxford's Bilateral Surgery Policy, their claim for declaratory relief also fails.

## C.  Attorney's Fees

The district court's denial of attorney's fees and costs was within its sound discretion.  29 U.S.C. § 1132(g)(1); Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987).

## D.  Documents Outside the Record

We disagree with the Krausses' position as to Oxford's submission on summary judgment of certain documents that were not in the administrative record.  We have repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, "but which discretion ought not to be exercised in the absence of good cause."  Juliano v. Health Maint. Org. of New Jersey, Inc., 221 F.3d 279, 289 (2d Cir. 2000) (internal quotation marks and citation omitted).  The Krausses, although failing to invoke this standard of review, argue that the district court acted in a manner "patently improper" because it admitted materials outside the administrative record, relied upon them, and then criticized the Krausses for failing to present contrary evidence.  Appellants' Br. at 63.  But the Krausses have not told us whether they challenged Oxford's submissions before the district court; identified the contents of the erroneously admitted evidence or whether or why there was not good cause for its admission; or

34

detailed precisely how, beyond conclusory statements regarding the inability to obtain discovery that they offer no proof of ever having requested, they suffered prejudice as a result of the error.  We need not decide whether the Krausses' arguments were sufficiently set forth to preserve appellate review of the matter.  See Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation and internal quotation marks omitted)).  Under these circumstances, the Krausses have failed to demonstrate that the district court lacked good cause for its decision to consider the challenged documents.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.