REVISED March 24, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

March 23, 2009

Charles R. Fulbruge III
Clerk

No. 08-30091

RICHARD LAFLEUR

Plaintiff-Appellant

v.

LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, doing business as Blue Cross Blue Shield of Louisiana

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Plaintiff-Appellant Dr. Richard Lafleur sued Defendant-Appellee Louisiana Health Service and Indemnity Company (Blue Cross) under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), for recovery of wrongfully denied health insurance benefits. The district court granted summary judgment in favor of Blue Cross. Because Blue Cross failed to substantially comply with ERISA's procedural requirements, the judgment of the district court is vacated, and the case is remanded for entry of an order remanding the case to the plan administrator for a full and fair review

regarding the denial of benefits. We express no opinion on whether Blue Cross abused its discretion in denying benefits because its substantial compliance with ERISA procedural regulations is a threshold issue in this case.

## I. Factual and Procedural Background

### A. Facts

Lafleur received health insurance benefits through his employer, The Family Clinic, Inc. Lafleur's group health insurance policy (the Plan), which was issued by Blue Cross, is an "employee welfare benefit plan" within the meaning of ERISA. See 29 U.S.C. § 1002(1).

On May 7, 2001, Lafleur underwent a cardiovascular bypass operation. During surgery, he suffered an anoxic event and never regained consciousness. On August 9, 2001, Blue Cross agreed to pay the cost of Lafleur's care at Eunice Manor Nursing Home (Eunice Manor) pursuant to the Plan's "Alternative Benefits" provision. Alternative Benefits are "[b]enefits for services not routinely covered under the Benefit Plan but which may be provided by agreement through Case Management." In turn, "Case Management" permits for payment of Alternative Benefits at Blue Cross's discretion, and such benefits "are provided in lieu of the Benefits to which [members] are entitled under the Benefit Plan." According to the Plan, the provision of Alternative Benefits should not be construed as a waiver of Blue Cross's right to enforce the Plan in accordance with its express terms, and Alternative Benefits can be terminated if the patient is no longer covered under the terms of the Plan. The August 9 letter stated that "[r]eimbursement for skilled nursing care ordered by Dr. Tate[, Lafleur's treating physician,] has been approved per a special agreement under the Individual Case Management Program." On August 20, 2001, Lafleur was transferred from an acute care hospital to Eunice Manor.

The issue on appeal revolves around whether Lafleur's care at Eunice Manor qualifies as Skilled Nursing Care, which is covered, or Custodial Care,

which is not. In its motion for summary judgment, Blue Cross stated that "[t]he alternative benefits arrangement that had been entered with Eunice Manor allowed it to be paid by Blue Cross as though it was a SNF (Skilled Nursing Facility) rather than a nursing home during the time that skilled nursing services were required." A SNF is defined by the Plan as a facility other than a nursing home that provides (1) inpatient medical care, treatment and skilled nursing care as defined by Medicare, (2) full-time supervision by at least one Physician or Registered Nurse, (3) twenty-four hour nursing services by Registered Nurses or Licensed Practical Nurses, and (4) utilization review plans for all patients. Article IV(A)(3) of the Plan states that "Inpatient Bed, Board and General Nursing Service" are covered "[i]n a Skilled Nursing Facility or Unit or while receiving skilled nursing services in a Hospital for the maximum number of days per Benefit Period shown in the Schedule of Benefits."[1]

Blue Cross initially agreed to cover costs of $516 per day for bed rental, 24-hour sitter service, supplies, nursing care, room, and board. On December 8, 2002, Blue Cross decreased this amount to $392 per day. On March 4, 2003, Blue Cross's Case Management department wrote to Eunice Manor indicating that it would reduce payments to $202 per day as "alternative care" for "all inclusive" room and board expenses. Both the December 8 letter and the March 4 letter described the per diem payments as "[r]eimbursement for skilled nursing."

On May 16, 2003, Blue Cross's Dr. William Weldon, after consulting with Blue Cross's Dr. Dwight Brower and an unidentified board certified urologist, determined that the nursing home's services provided to Lafleur constituted "Custodial Care," and that, pursuant to the Plan, Blue Cross would no longer

---

[1] We question, but do not resolve, Blue Cross's contention that Lafleur was not entitled to any benefits that he received at Eunice Manor pursuant to the Alternative Benefits section of the Plan.

approve reimbursement. Dr. Weldon and Dr. Brower did not consult with either of Lafleur's treating physicians, Dr. Tate or Dr. Heinen. In his deposition, Dr. Brower testified that he contacted the urologist via telephone to inquire whether continuous bladder irrigation (CBI) was a skilled nursing service and whether there were non-skilled alternatives to that procedure. Because CBI is not a common procedure, Dr. Brower and Dr. Weldon "opted to get some specialty input over that service and get more information regarding it." Dr. Brower described his consultation with the urologist as "entirely an informal telephonic conversation done anonymously relative to this patient" to determine whether CBI was "standard procedure done by urologists for recurrent infections in someone with a chronic and dwelling foley catheter." The May 16 denial letter did not elaborate on the specific reason for the denial beyond the following: "Contractual Exclusion for Custodial Care per Medical Director." Dr. Weldon made the following entry in the administrative record the day before the denial:

> Deny further days. Reimbursement has continued to this point due to the continued CBI. Review with a board certified urologist indicates that this is neither necessary nor appropriate and that the same purpose could be accomplished with a condom catheter or, if an indwelling catheter is necessary, low dose of fluoroquinolones (i.e. Cipro 500 mg/day). Denial is based on contractual exclusion for custodial care.[2]

Under the Plan, excluded "Custodial Care" refers to treatment or services "that could be rendered safely and reasonably by a person not medically skilled, or that are designed mainly to help the patient with daily living activities." On May 29, 2003, in preparation for administrative appeal, Lafleur requested from

---

[2] On May 15, 2003, Blue Cross's Shelly Martinez, a registered nurse, made an entry in the administrative record suggesting that the urologist's CBI opinion was the exclusive reason for the initial denial.

Blue Cross the complete administrative record and the names of all persons Blue Cross consulted "whether the consultant's opinion was relied upon or not."[3]

## B.    Procedural Background

Lafleur administratively appealed Blue Cross's determination twice (the "Level I Appeal" and the "Level II Appeal"). Dr. Brower conducted the Level I Appeal, and an appeals committee conducted the Level II Appeal. As part of the Level I Appeal, Dr. Brower made the following entry in the administrative record on June 9, 2003: "Will uphold the denial of continued skilled nursing unit coverage as the patient's care is now primarily custodial and therefore excluded by this policy. Care can be provided in a regular nursing home bed."[4] Lafleur received the Level I denial letter on July 24, 2003. The July 24 letter, which was drafted by an attorney in Blue Cross's Legal Affairs Department, provided a more detailed explanation of the reason for denial than the May 16 letter:

> Our records indicate that in December 2002, pursuant to a special agreement under the Individual Case Management Program, we approved reimbursement of skilled nursing care at Eunice Manor Nursing Home for Richard Lafleur for services ordered by Dr. Tate.
>
> As is customary, our Case Management Department continuously monitored the services being rendered to Dr. Lafleur to ensure that

---

[3] Eunice Manor sent Blue Cross a letter on May 23, 2003, requesting "informal reconsideration" of the denial on behalf of Lafleur. The May 23 letter stated that "[i]t is the opinion of both Richard Lafleur's physician, Dr. Richard Tate and our facility medical director, Dr. Brian Heinen, that the resident / patient requires skilled nursing medical services on a continuous basis." Eunice Manor observed that Lafleur had been hospitalized nine times since his admission on August 20, 2001, and that he consistently required medical attention for routine care and complications related to his tracheotomy tube. Blue Cross apparently treated Eunice Manor's request as a separate appeal and rejected it by letter dated July 11, 2003, citing the Custodial Care exclusion.

[4] Lafleur argues that the Custodial Care exclusion does not apply because Dr. Weldon described his care as "near custodial" and Dr. Brower described it as "primarily custodial." We will let the parties explore this issue on remand. See Wegner v. Standard Ins. Co., 129 F.3d 814, 818 (5th Cir. 1997) ("Only if the [ERISA] plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of contra proferentum and construe the terms strictly in favor of the insured.") (emphasis in original).

the care being received was eligible for reimbursement under the contract and in accordance with the Case Management Agreement. Eventually, the medical information we received indicated that the care being rendered to Dr. Lafleur was custodial in nature, and that skilled nursing care was not needed. For this reason, we advised the hospital and patient on May 16, 2003 that subsequent days would not be covered if hospitalization continued beyond that date as Dr. Lafleur's contract does not provide benefits for custodial care.

At his deposition, Dr. Brower testified that he did not consult with any other health care professional in conducting the Level I Appeal.

On September 15, 2003, as part of the Level II Appeal, Lafleur submitted a letter from his treating physician, Dr. Tate, which stated that Lafleur's "condition is very fragile and his long term survival is dependent on good skilled nursing rather than custodial care." Dr. Tate stated that Lafleur needed skilled nursing to monitor his vital signs, fluid intake, diabetes, nourishment status, skin care, trache care, foley care, peg tube care, and to observe for pulmonary infiltrates and mucus plugs that could result in severe hypoxia.[5] In affirming the denial based on the Custodial Care exclusion, the Level II appeals committee consulted with Dr. Brower and found that "the clinical issues are the tracheotomy and . . . tube feeding. Patient is stable so the extent of the care doesn't have to be <u>skilled</u> nursing."[6] (emphasis in original). Apparently, the Level II appeals committee only consulted with Dr. Brower before making its final determination, and Dr. Brower did not produce any written report that was responsive to the concerns raised by Dr. Tate. By letter dated October 1, 2003,

---

[5] At oral argument, Lafleur's counsel stated that a medical director at Blue Cross visited Lafleur at Eunice Manor in October 2002, concurred in Dr. Tate's assessment, and sustained the continuation of benefits at that time.

[6] On February 27, 2003, Martinez made the following entry in the administrative record: "Patient has been stable for months[.] [S]till frequent suctioning but will continue to pay for snf [Skilled Nursing Facility]. [S]till has cbi's [Continuous Bladder Irrigations] and frequent suctioning." Martinez made a similar entry on April 16, 2003.

the Level II Appeals Committee cited the Custodial Care exclusion and denied Lafleur's claim.

On June 10, 2004, Lafleur, having exhausted the Blue Cross administrative review procedure, filed suit in district court alleging that (1) Blue Cross's appeal proceedings did not adhere to mandatory ERISA procedures, and (2) Blue Cross's interpretation of the Plan as to Lafleur constituted an abuse of discretion. During the pendency of the district court proceedings, Lafleur died in November 2005. The parties filed cross-motions for summary judgment, and on December 18, 2007, the district judge granted Blue Cross's motion and denied Lafleur's motion. The district court did not address Lafleur's argument that Blue Cross failed to substantially comply with the procedural requirements of ERISA. Lafleur timely appealed.

## II. Analysis

### A.     Summary Judgment Standard

"We review a district court's grant of summary judgment in ERISA cases de novo, applying the same standard as the district court." Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, 493 F.3d 533, 537 (5th Cir. 2007). A grant of summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "In evaluating the existence of a genuine issue of material fact, we review the evidence and inferences drawn from that evidence in the light most favorable to the non-moving party." Wade, 493 F.3d at 537.

### B.     Procedural Violations

#### 1.     Substantial Compliance

Lafleur alleges that Blue Cross violated several ERISA procedural requirements when processing his administrative appeal. "These procedures are set forth in [29 U.S.C.] § 1133 of ERISA and in the Department of Labor

regulations promulgated pursuant to that section."[7]  Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 393 (5th Cir. 1998).  In the Fifth Circuit, we evaluate Lafleur's procedural claims as follows:

> Challenges to ERISA procedures are evaluated under the substantial compliance standard.  Lacy v. Fulbright & Jaworski, 405 F.3d 254, 256-57 & n. 5 (5th Cir. 2005). This means that the "technical noncompliance with ERISA procedures will be excused so long as the purpose of section 1133 has been fulfilled." Robinson v. Aetna Life Ins., 443 F.3d 389, 393 (5th Cir. 2006). The purpose of section 1133 is "to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." Schneider v. Sentry Long Term Disability, 422 F.3d 621, 627-28 (7th Cir. 2005). The "substantial compliance" test also "considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." Moore v. LaFayette Life Ins. Co., 458 F.3d 416, 436 (6th Cir. 2006). "All communications" may include oral communications.  White v. Aetna Life Ins. Co., 210 F.3d 412, 417 (D.C. Cir. 2000) (citing Heller v. Fortis Benefits Ins. Co., 142 F.3d 487, 493 (D.C. Cir.1998)).

Wade, 493 F.3d at 539.

In interpreting "full and fair review," we have looked favorably upon decisions that require "'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties

---

[7] Under 29 U.S.C. § 1133, every employee benefit plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

prior to reaching and rendering his decision.'" Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 598 (5th Cir. 1994) (quoting Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 893–94 (10th Cir. 1988)). Substantial compliance requires "meaningful dialogue" between the beneficiary and administrator. See Wade, 493 F.3d at 540.

ERISA regulations provide insight into what constitutes full and fair review. Applicable regulations dictate that procedures "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination" unless several procedural requirements are met, four of which are relevant to this appeal: (1) review must "not afford deference to the initial adverse benefit determination" and may not be "conducted" by the same person who made the initial determination;[8] (2) when an "adverse benefit determination . . . is based in whole or in part on a medical judgment," the appeal must include consultation "with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment";[9] (3) the claims procedure must "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination";[10] and (4) the healthcare professional consulted in an appeal may not be the same individual who was consulted in connection with the original determination.[11]

---

[8] 29 C.F.R. § 2560.503-1(h)(3)(ii).

[9] Id. § 2560.503-1(h)(3)(iii).

[10] Id. § 2560.503-1(h)(3)(iv).

[11] Id. § 2560.503-1(h)(3)(v).

We find that Blue Cross did not substantially comply with the procedural requirements of ERISA because (1) it raised new grounds for denial in the federal courts that were not raised at the administrative level; (2) it did not identify the board certified urologist, despite Lafleur's request for this information; (3) it relied on the same urologist's opinion in the initial denial and in the administrative appeals; (4) to the extent it did not rely on the urologist's opinion in the administrative appeals, it relied on Dr. Brower's opinion even though he did not possess appropriate training and experience in the field of urology;[12] and (5) it effectively gave deference to the initial denial.

At the administrative level, Blue Cross consistently maintained that Lafleur's care changed from skilled nursing to custodial during his extended stay at Eunice Manor, and by May 2003, "skilled nursing care was not needed."[13] Central to this conclusion was the opinion of the board certified urologist, who opined that there were non-skilled alternatives to the CBI procedure. However, for the first time in the district court and on appeal, Blue Cross argued that continued payment of Alternative Benefits was an act of charity that could be suspended at any time because Lafleur was never entitled to those benefits in the first place.[14] In other words, rather than changing from skilled nursing to

---

[12] Dr. Weldon, who conducted the initial review resulting in a denial of benefits, was a surgeon. Dr. Brower, who conducted the Level I Appeal, was a family practitioner.

[13] Blue Cross reiterated this position in its motion for summary judgment, stating that "Dr. Lafleur's care had devolved to the extent that it constituted 'Custodial Care' under the terms of the Plan . . . . When it was determined that skilled nursing services were not required, that regular nursing home services were what was needed, Blue Cross concluded the arrangement . . . ." (emphasis added).

[14] In its brief, Blue Cross stated that "Dr. Lafleur's health plan did not provide benefits for [nursing home] care. However, in recognition of the tragedy of the situation, and based on the outside chance that he might improve, Blue Cross agreed to provide 'Alternative Benefit Care' for Dr. Lafleur."

custodial, Lafleur's care was always custodial.[15] Blue Cross also argued that the denial was justified based on a different phrase within the Custodial Care exclusion: "long-term treatment for a condition in a patient who is not expected to improve or recover."[16] According to Blue Cross, Lafleur's condition had consistently deteriorated rather than improved between August 2001 and May 2003, making recovery highly improbable. These alternative reasons for denial may or may not be legitimate, but the fact remains that these were not the reasons for denial given at the administrative level.[17] To ensure the full and fair review contemplated by ERISA, the specific reason or reasons for denial must be clearly identified at the administrative level in order to give the parties an opportunity for meaningful dialogue. See Robinson, 443 F.3d at 393. Although these various reasons for denial are all generally based on the Custodial Care exclusion, the lack of specificity in the denial letters did not give Lafleur the fair notice contemplated by the ERISA regulations. See 29 C.F.R. § 2560.503-1(g)(i);

---

[15] This argument seems intuitive because Lafleur was receiving care in a nursing home, which is traditionally associated with custodial care. However, it appears undisputed that Eunice Manor was receiving "[r]eimbursement for skilled nursing services," which are covered, to some extent, under the terms of the Plan. On February 26, 2003, Dr. Weldon made an entry in the administrative record stating that "the nursing home is being reimbursed at a skilled level and the patient is at a near custodial level of care." The administrative record is replete with medical records suggesting that Lafleur suffered from various complications and medical conditions requiring skilled nursing on an ongoing basis.

[16] Blue Cross states that its provision of Alternative Benefits "does not estop Blue Cross from subsequently denying custodial care benefits 19 months later when it became abundantly clear that Dr. Lafleur had not and would not recover." A significant portion of Blue Cross's brief and oral argument was dedicated to this position. If Lafleur was adequately informed about this basis for denial, he could have introduced medical evidence into the administrative record related to his long-term prognosis. See 29 C.F.R. § 2560.503-1(h)(2)(ii). Blue Cross does not directly identify any medical evidence in the administrative record supporting its prognosis.

[17] In its order affirming the denial of benefits, the district court relied on both of these alternative reasons for denial. It noted that "Blue Cross initially agreed to pay alternative benefits that were ordinarily not covered by the Plan" and that "long-term treatment for a condition in a patient who is not expected to improve or recover" falls within the Custodial Care exclusion.

see also McCartha v. Nat'l City Corp., 419 F.3d 437, 446 (6th Cir. 2005) ("[D]efendants were not in substantial compliance with the requirements of § 1133 because McCartha was never timely informed that the failure to provide current medical opinions as to her long-term disability would be one of the bases for the termination of her benefits.") (emphasis added).

Blue Cross failed to comply with 29 C.F.R. § 2560.503-1(h)(3)(iv) when it did not identify the board certified urologist "whose advice was obtained on behalf of the plan in connection with [Lafleur's] adverse benefit determination."[18] Notably, Lafleur specifically requested this information in his May 29 letter to Blue Cross. The urologist's opinion that there were non-skilled alternatives to the CBI procedure appears to be the primary, if not exclusive, basis for denial of benefits in both the initial determination and the Level I Appeal.

Because the adverse benefit determination was based on the medical judgment that Lafleur's care was custodial, Blue Cross was required to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" when deciding the administrative appeal.[19] 29 C.F.R. § 2560.503-1(h)(3)(iii). Dr. Brower and Dr. Weldon were not urologists, and the only expert consulted with experience in that field was the unidentified board certified urologist that Dr. Brower contacted before the initial denial. Under 29 C.F.R. § 2560.503-1(h)(3)(iii), Blue

---

[18] At oral argument, Lafleur's counsel indicated that Lafleur did not know that a urologist had been contacted by Blue Cross. Thus, as opposed to lack of knowledge of the urologist's name, Lafleur did not even know the substance of the urologist's opinion.

[19] The conclusion that there are non-skilled alternatives to CBI or that CBI can be performed by a non-skilled individual are "medical judgment[s]" for purposes of § 2560.503-1(h)(3)(iii). Blue Cross argues that Dr. Brower's brief consultation with the urologist was similar to review of a "medical textbook," which does not trigger the disclosure requirement. Assuming arguendo that this is true, we have previously required that excerpts from authoritative treatises be included in the administrative record if they are relied upon by the administrator to deny benefits. See Robinson, 443 F.3d at 394-95. Under ERISA regulations, the administrator must turn over this material when requested by the claimant, which was not done in this case. 29 C.F.R. § 2560.503-1(h)(2)(iii).

Cross could not rely on the same urologist's opinion in the initial determination and in the administrative appeals. To the extent that the Level I Appeal and the Level II Appeal only relied on the opinion of Dr. Brower, he did not have the appropriate training and experience to render an opinion regarding the CBI procedure. See id. Finally, although Dr. Brower arguably only "conducted" the Level I Appeal, his presence as the primary consultant in both the initial denial and the Level II Appeal effectively gave deference to the initial adverse benefit determination in violation of 29 C.F.R. § 2560.503-1(h)(3)(ii). Dr. Brower did not consult any other doctor during the Level I Appeal, and the Level II appeals committee appears to have relied exclusively on Dr. Brower's analysis and medical assessment.[20] While the same doctor can participate in (rather than conduct) both administrative appeals,[21] exclusive reliance on the opinion of the same doctor in both appeals runs afoul of § 2560.503-1(h)(3)(ii). We hold that Blue Cross's procedural violations constituted more than "technical noncompliance" and prejudiced Lafleur. See Robinson, 443 F.3d at 394.

2. Remedy

Because we rarely find that an administrator failed to substantially comply with the procedural requirements of ERISA, we have not fully identified the scope of available remedies. We have previously stated the following regarding remedies: "Even were we to decide [that an administrator failed to substantially comply with ERISA and its accompanying regulations], '[f]ailure to fulfill procedural requirements generally does not give rise to a substantive

---

[20] At oral argument, Blue Cross's counsel conceded that every member of the Level II appeals committee was a lay person. Consequently, the members of the appeals committee were unable to form their own independent medical judgments and were reliant upon Dr. Brower's opinion. Based on the unique facts of this case, Dr. Brower's role in the Level II Appeal effectively gave deference to his denial in the Level I Appeal because he was the only doctor that participated in the Level II Appeal.

[21] Group health plans cannot require a claimant to file more than two administrative appeals. 29 C.F.R. § 2560.503-1(c)(2).

damage remedy.'" Wade, 493 F.3d at 540 (quoting Hines v. Mass. Mut. Life Ins. Co., 43 F.3d 207, 211 (5th Cir. 1995)). Substantive damages would be permitted only "when the violations are continuous and amount to substantive harm." Hines, 43 F.3d at 211 (citing Blau v. Del Monte Corp., 748 F.2d 1348, 1353 (9th Cir. 1985), abrogated on other grounds by Dytrt v. Mountain States Tel. & Tel. Co., 921 F.2d 889, 894 n.4 (9th Cir. 1990)). Substantive damages would include a retroactive reinstatement of benefits. McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1315 n.4 (9th Cir. 1994), abrogated on other grounds by Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 973 (9th Cir. 2006) (en banc). Although we recited the Blau standard in Hines, we have not elaborated on it or applied it. Based on the particular facts of this case, we believe that remand, rather than substantive damages, is the appropriate remedy.

### a. Remand

Remand to the plan administrator for full and fair review is usually the appropriate remedy when the administrator fails to substantially comply with the procedural requirements of ERISA. See Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008); Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 240 (4th Cir. 2008); Chuck v. Hewlett Packard Co., 455 F.3d 1026, 1035 (9th Cir. 2006); Caldwell v. Life Ins. Co of N. Am., 287 F.3d 1276, 1288-89 (10th Cir. 2002); Syed v. Hercules Inc., 214 F.3d 155, 162 (3d Cir. 2000) (Alito, J.); VanderKlok v. Provident Life & Accident Ins. Co., 956 F.2d 610, 616-17 (6th Cir. 1992); Wolfe v. J.C. Penney Co., 710 F.2d 388, 393-94 (7th Cir. 1983), overruled on other grounds by Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 n.4 (7th Cir. 1994). This position is consistent with the default rule of other circuits and our pronouncement in Wade that procedural violations of ERISA generally do not give rise to a substantive damages remedy. When the procedural violations are non-flagrant, remand is typically preferred over a substantive

remedy to which the claimant might not otherwise be entitled under the terms of the plan. See Gagliano, 547 F.3d at 240; see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989) ("ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.") (emphasis added) (citation omitted).

Rather than remand, Lafleur argues that we should grant summary judgment in favor of him and award benefits. This exception to the remand rule applies "where the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law." Gagliano, 547 F.3d at 240. Our opinion in Robinson v. Aetna Life Insurance Co. falls within this category. See 443 F.3d 389, 397 (5th Cir. 2006) ("[T]here is no genuine issue of material fact here. We have concluded both that Aetna failed to substantially comply with ERISA procedures and that Aetna abused its discretion by terminating Robinson's benefits.") (emphasis added). "A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." Caldwell, 287 F.3d at 1289 (internal citations and quotation marks omitted). If the administrative record reflects, at minimum, a colorable claim for upholding the denial of benefits, remand is usually the appropriate remedy. See Gagliano, 547 F.3d at 240. The court must make this determination on a case-by-case basis. See Robinson, 443 F.3d at 497 & n.5. Based on the administrative record before us, we do not believe that Lafleur is entitled to judgment as a matter of law.[22]

---

[22] Another exception that might apply is where remand would be a useless formality. An administrator's failure to substantially comply with the procedural requirements of ERISA will usually prevent a plaintiff from adequately developing the administrative record and presenting his arguments, so this futility exception should be narrowly construed and sparingly applied. The court might find that remand would be a useless formality where "much, if not

## b.     Modifying the Standard of Review

"When the ERISA plan vests the fiduciary with discretionary authority to determine eligibility for benefits under the plan or to interpret the plan's provisions, our standard of review is abuse of discretion."[23]  Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 269 (5th Cir. 2004) (internal quotation marks omitted).  The administrator's factual determinations are also reviewed for abuse of discretion.  Wade, 493 F.3d at 537.  Lafleur argues that we should modify this deferential standard of review based on the administrator's failure to substantially comply with the procedural requirements of ERISA.  Although we have never definitively rejected the availability of this remedy, we have previously refused to apply it.  Id. at 538 ("Wade has cited no direct authority by the Supreme Court or the Fifth Circuit dictating a change in the standard of review based upon procedural irregularities alone, and we see no reason to impose one.").

The Ninth Circuit, sitting en banc, has held that flagrant procedural violations can alter the standard of review from abuse of discretion to de novo.

---

all, the objective [] evidence supports the conclusion that [the] plaintiff [is not covered under the terms of the policy]." See Kent v. United of Omaha Life Ins. Co., 96 F.3d 803, 807 (6th Cir. 1996).  In making this determination, the court should consider not only the evidence in the administrative record, but also the evidence that the plaintiff would have submitted but for the administrator's procedural violations.  The administrator should not be allowed to hinder the development of the administrative record through its procedural violations, and then invoke the futility exception based solely on the limited evidence contained within that record. The court might also find that remand would be a useless formality where the death of the plaintiff makes the presentation of additional evidence impossible and where the existing evidence is legally insufficient to establish entitlement to benefits.  See Schleibaum v. Kmart Corp., 153 F.3d 496, 503-04 (7th Cir. 1998).  Even assuming the plaintiff died, however, remand is still appropriate if the procedural violations prevented the administrator from adequately considering all available evidence supporting the plaintiff's claim for benefits. Remand would not be a useless formality in this case because the available evidence suggests that Lafleur's care might require skilled nursing.

[23] Article XXI(A)(4) of the Plan states the following: "We [Blue Cross] have full discretionary authority to determine eligibility for Benefits and/or to construe the terms of this Benefit Plan."

"When an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, [the court will] review de novo the administrator's decision to deny benefits," even if the abuse of discretion standard would apply otherwise.[24]   Abatie, 458 F.3d at 971.  All other non-flagrant procedural irregularities should be "weighed in deciding whether an administrator's decision was an abuse of discretion." Id. at 972. "A more serious procedural irregularity may weigh more heavily."  Id.  When the administrator has failed to follow the procedural requirements of ERISA, the district court may take additional evidence when irregularities have prevented full development of the administrative record.  Id. at 973.

Although Blue Cross failed to substantially comply with the procedural requirements of ERISA, these violations were not flagrant, so the de novo standard of review discussed in Abatie is not implicated in this case.  Because the issue is not before us, we express no opinion on whether flagrant procedural violations of ERISA can alter the standard of review.  "Instead, we face the more ordinary situation in which a plan administrator has exercised discretion but, in doing so, has made procedural errors."  Id. at 972.  Based on the facts of this case, we find that remand to the administrator is warranted, rather than remand to the district court for consideration of evidence outside the administrative record.[25]

---

[24] Blau provides the paradigmatic example of flagrant procedural violations: "The undisputed facts show that defendants failed to comply with virtually every applicable mandate of ERISA . . . . Here, there was no summary plan description, no claims procedure, and no provision to inform participants in writing of anything.  Del Monte's claims procedure fails simply because there was none."  748 F.2d at 1353.

[25] Pre-Abatie, the Ninth Circuit cited approvingly to authority from the Third Circuit holding that "the usual remedy for a violation of § 1133 is 'to remand to the plan administrator so the claimant gets the benefit of a full and fair review.'"  See Chuck, 455 F.3d at 1035 (quoting Syed, 214 F.3d at 162).  Furthermore, several district courts within the Ninth Circuit have remedied procedural violations by remanding the claim to the administrator for a full and

c.      Striking Evidence or Retroactively Reinstating Benefits

As an alternative to modifying the standard of review, Lafleur urges us to strike the urologist's opinion or retroactively reinstate his benefits in order to remedy the administrator's procedural violations. The availability of these two remedies is supported by persuasive precedent. In Bard v. Boston Shipping Association, the First Circuit addressed a situation where the "procedural irregularities [] were serious, had a connection to the substantive decision reached, and call[ed] into question the integrity of the benefits-denial decision itself." 471 F.3d 229, 244 (1st Cir. 2006). After observing that the administrator's procedural violations had the effect of "sandbagging" the plaintiff, the First Circuit struck the evidence supporting the denial and awarded benefits to the plaintiff based on the remaining evidence. Id. at 244-45. The First Circuit recognized that "[i]n other circumstances, it might be an appropriate remedy to remand to a plan administrator for reconsideration," see id. at 245-46, but declined to do so based on the rather egregious facts of the case. See id. at 246. In cases where the administrator terminated benefits that were already granted (rather than initially denying benefits), the Sixth and Seventh Circuits have held that retroactive reinstatement of benefits is an appropriate remedy for procedural violations in order to return the plaintiff to the status quo ante. See Wenner v. Sun Life Assurance Co. of Canada, 482 F.3d 878, 883-84 (6th Cir. 2007); Schneider v. Sentry Group Long Term Disability Plan, 422 F.3d 621, 629-30 (7th Cir. 2005).

We decline to strike the urologist's opinion because the procedural violations were not as serious as those in Bard. Although Blue Cross

---

fair review. See, e.g., Murch v. Prudential Welfare Benefit Plan, No. C05-0992P, 2006 WL 1418677, at *9 (W.D. Wash. May 23, 2006) (unpublished); Teen Help, Inc. v. Operating Eng'rs Health & Welfare Trust Fund, No. C 98-2084 VRW, 1999 WL 1069756, at *6 (N.D. Cal. Aug. 24, 1999) (unpublished); Jenkinson v. Chevron Corp., 634 F. Supp. 375, 380 (N.D. Cal. 1986).

discontinued benefits that Lafleur was already receiving, we do not believe that retroactive reinstatement of benefits is appropriate because Lafleur is not in continuing need of these benefits, and his death makes a return to the status quo ante impossible. The fact that Lafleur received his benefits pursuant to the "Alternative Benefits" section of his Plan also counsels against the use of these two potent remedies. We express no opinion on whether these two remedies would be appropriate in other factual circumstances. On remand, the administrator can determine whether Lafleur is entitled to a lump sum payment for wrongfully denied benefits between May 2003 and November 2005.[26]

## III. Conclusion

Because Blue Cross failed to substantially comply with ERISA's procedural requirements, the judgment of the district court is VACATED, and the case is REMANDED for entry of an order remanding the case to the plan administrator for a full and fair review regarding the denial of benefits. This remand pretermits the necessity of reviewing Blue Cross's denial on the merits. If Blue Cross denies benefits again after full and fair review, the district court can review that decision under the appropriate standard, with the benefit of a fully developed administrative record.[27]

---

[26] At oral argument, Lafleur's counsel stated that this amount is approximately $200,000. Blue Cross noted that Lafleur began to receive Medicare benefits several months after May 2003. Blue Cross's entitlement to an offset, if any, can be addressed on remand if necessary.

[27] Other than the unidentified urologist's opinion that there were non-skilled alternatives to CBI, we were unable to locate any competent medical evidence in the administrative record (i.e., a written expert report) that refuted Dr. Tate's and Dr. Heinen's opinions that Lafleur's specific medical conditions required skilled nursing. CBI was used to treat one of Lafleur's many conditions. Blue Cross did not even attempt to rebut the specific contentions made in Dr. Tate's letter dated September 15, 2003. Because Blue Cross is both the plan administrator and the insurer, this conflict "should be weighed as a factor in determining whether there is an abuse of discretion." Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008) (citation and internal quotation marks omitted). The weight of this factor will depend upon the facts of the case. Id. at 2351. However, Blue Cross's conclusory opinion that Lafleur's care is custodial, without supporting medical evidence, is insufficient to carry

VACATED AND REMANDED.

---

its burden. See Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 302 (5th Cir. 1999) (en banc). Blue Cross is not required to defer to the opinions of Lafleur's treating physicians, see Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), but if it does not, then it must specifically identify other medical evidence that supports its determination.