[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13060

_____

D.C. Docket No. 1:15-cv-03285-ELR


O.D.,

Plaintiff - Appellant,

versus

JONES LANG LASALLE MEDICAL PPO PLUS PLAN,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 15, 2019)

Before WILSON, JILL PRYOR, and TALLMAN,[*] Circuit Judges.

WILSON, Circuit Judge:

_____

[*] Honorable Richard C. Tallman, Circuit Judge for United States Court of Appeals for the Ninth Circuit, sitting by designation.

O.D. is a minor covered by an Employee Retirement Income Security Act (ERISA) healthcare plan administered by Jones Lang LaSalle Medical PPO (the Plan). O.D.'s plan covered medically necessary mental health treatment. The mental health portion of the ERISA plan is administered by United Behavioral Health (UBH).[1] O.D. entered treatment for bulimia at Veritas Collaborative, a residential eating disorder treatment center. UBH determined that O.D.'s treatment was not medically necessary and denied coverage. The district court granted summary judgment for Jones Lang and UBH, holding that its denial of benefits was proper under a deferential arbitrary and capricious standard. After careful review and with the benefit of oral argument, we affirm.

## I. Background

### A. O.D.'s Health

O.D. began treatment for bulimia[2] at Veritas. When admitted, O.D. was at a healthy weight, and while she acknowledged that she had suicidal thoughts, she had never attempted suicide. Veritas admitted O.D. into its inpatient treatment program—the most intensive level of care.[3] After just one day in inpatient

---

[1] For purposes of our review, Jones Lang and UBH are treated a single entity. Because UBH was the principal actor, we refer to them collectively as UBH.

[2] Bulimia is an eating disorder characterized by periods of binging (eating to excess) typically followed by "purging" (self-induced vomiting).

[3] Veritas developed a treatment plan with declining levels of care, from most intensive to least intensive: (1) inpatient treatment for five days; (2) residential treatment; (3) partial hospitalization program; and finally (4) outpatient program.

treatment, O.D. transitioned to residential treatment, where she remained for about two months.  During her stay, O.D.'s psychotherapist reported that she required supervision when using the bathroom to ensure she was not purging.  O.D. experienced urges to binge, purge, and engage in self harm; displayed possible symptoms of depression, bipolar, and anxiety; required structure around meals; and admitted that if she was unsupervised, she would start purging.  O.D.'s health improved significantly during her stay at Veritas—after three days at Veritas, she was actively engaging in therapy, completing meals, and reporting improvements in her desire to binge and purge.  O.D. was doing so well that Veritas gave her "therapeutic passes" to go on outings with her family to museums and restaurants.

## B.  The Plan

The Plan provides benefits for medically necessary mental health treatment. The Plan defines "medically necessary" in relevant part as services that are "clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for [the insured's] . . . Mental Illness."  The Plan excludes from coverage mental health treatment that—"in the reasonable judgment of UBH"—is "not consistent with the Mental Health/Substance Use Disorder Administrator's level of care guidelines" or "not clinically appropriate for the patient's Mental Illness . . . based on generally accepted standards of medical practice."

3

## C.  Procedural History

UBH initially denied O.D.'s claim for benefits for: (1) her single-day inpatient treatment and (2) her ongoing residential treatment at Veritas.  A UBH physician explained the decision, noting that O.D. was "medically stable, and does not require 24 hour monitoring for medical or psychiatric symptoms."  The physician concluded that O.D. "could continue to have treatment in an eating disorder partial hospital program for eating disorders."  The denial letter explained that the decision was "[b]ased on our Level of Care Guideline for Mental Health Residential Rehabilitation Level of Care" and included a website link[4] to UBH's Level of Care Guidelines.

O.D. filed an urgent appeal with UBH.  A board-certified psychiatrist at UBH reviewed O.D.'s records and spoke with her healthcare provider.  UBH then partially reversed its prior decision and approved coverage for four days of residential treatment but not her one day of inpatient treatment or two months of residential treatment.  UBH wrote another letter to O.D.'s parents, explaining that O.D. "has been progressing well" and could continue treatment in a lower level of care.  It again referred to UBH's Mental Health Residential Rehabilitation Level of Care Guideline.

---

[4] O.D. disputes that the link worked properly, but the district court did not find any record evidence to support O.D.'s contention.

4

After O.D. left Veritas, Veritas appealed to UBH again on O.D.'s behalf.  In that appeal, Dr. Jennie Lacy—Veritas' psychotherapist—opined that residential hospitalization was warranted given O.D.'s need for constant monitoring.  She wrote that her opinion was "based on [American Psychiatric Association] Guidelines."  Another UBH psychiatrist reviewed O.D.'s file.  He approved coverage for O.D.'s one day of inpatient treatment and four days of residential treatment but denied coverage for any further residential treatment.  The psychiatrist explained that O.D. "had no complications of refeeding edema, was not suicidal or self mutilates and was generally cooperative with care."  The doctor opined that O.D. "could have been monitored adequately in Partial Hospitalization; especially that it is a seven-day per week program."

After the final denial, O.D. filed suit, seeking coverage for the remainder of her residential treatment.  The district court granted summary judgment in favor of Jones Lang and UBH.  O.D. appealed.

## II.  Discussion

### A.  Deference to ERISA Plan Administrator's Coverage Decision

Under § 1132 of ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  ERISA does not provide how

5

courts should interpret ERISA plans, but federal courts "have the authority to develop a body of federal common law" to govern their interpretation and enforcement. *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1234–35 (11th Cir. 2006). Courts review the coverage decision of a plan administrator de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

In *Blankenship v. Metro Life Ins. Co.*, we outlined a six-part test for determining the appropriate standard of review under *Firestone*:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining

6

whether an administrator's decision was arbitrary and capricious.

644 F.3d 1350, 1355 (11th Cir. 2011).  Under the first three steps, even when the administrator's decision was de novo wrong, we apply a deferential arbitrary and capricious standard if the plan vests the administrator with discretion to review claims.[5]  *Id.*  In reviewing a plan administrator's medical necessity determination, we only consider the material available to the administrator at the time it made its decision.  *See id.* at 1354.

The first question, then, is whether the ERISA Plan vested the plan administrator with discretion to make coverage decisions.  This grant of discretion must be apparent from the text of the Plan.  *See Kirwan v. Marriot Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) ("This circuit has interpreted [*Firestone Tire*] to mandate *de novo* review unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms.").  The parties agree that the Plan expressly grants UBH the discretion to make medical

_____

[5] We need not decide whether UBH's decision was de novo wrong.  Instead, consistent with our precedent, we may assume the decision was de novo wrong in order to reach the discretion question.  *See, e.g.*, *Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352, 1357 (11th Cir. 2008) (on review of summary judgment, skipping straight to step two and determining whether the administrator had discretion to review benefit claims under the plan); *see also Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) ("Discretion is the exception, not the rule and . . . the arbitrary and capricious standard does not apply unless there is a clear grant of discretion to determine benefits or interpret the plan.").

necessity determinations.  The arbitrary and capricious standard is therefore appropriate.  *Id.* at 1355.

### B.  *Effect of Procedural Deficiencies on Deference*

Although the parties agree that the arbitrary and capricious standard is generally appropriate when an ERISA plan vests discretion in the plan administrator to make medical necessity determinations, O.D. argues that a less deferential standard should apply in this case because UBH failed to comply with ERISA procedural regulations.

Under 29 C.F.R. § 2560.503-1(g), a plan administrator must notify the claimant in writing of any adverse decision.  The notification must, "in a manner calculated to be understood by the complainant," provide in relevant part: (a) "the specific reason . . . for the adverse determination"; (b) "the specific plan provisions on which the determination is based"; and (c) "[a] description of additional material or information for the claimant to perfect the claim and an explanation of why such material or information is necessary."  *Id.* at § 2560.503-1(g)(i)–(iii).  When the decision is based on medical necessity, as here, ERISA generally requires "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances . . . ."  *Id.* at § 2560.503-1(g)(v)(B).

8

But a notice of an adverse benefit determination need only "substantially comply" with the ERISA notice requirements. *See Perrino v. So. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1317–18 (11th Cir. 2000); *Counts v. Gen. Life Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997). A letter substantially complies with the notice requirements if the letter "taken as a whole, . . . supplied [the plaintiff] with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Counts*, 111 F.3d at 108 (quotations omitted).

UBH substantially complied with ERISA's notice requirements. First, while the letters did not expressly refer to the plan's "medical necessity" definition, each letter explained that although O.D. was suffering from an eating disorder, her medical records did not support a finding that inpatient or residential treatment was necessary. The letters specifically identified an alternative level of care—partial hospitalization—that UBH psychiatrists opined could properly address O.D.'s condition. It is clear from these descriptions that UBH was referring to its medical necessity definition, which requires that the level of care be, among other things, "clinically appropriate, in terms of type, frequency, extent, site and duration." Second, although the Level of Care Guidelines were not attached to the letters, the letters identified the relevant Guideline ("Level of Care Guideline for Mental Health Inpatient Level of Care" and "Level of Care Guidelines for Mental Health

9

Residential Rehabilitation Level of Care"). The letters also included a link to the Level of Care Guidelines.

UBH's letters sufficiently informed O.D. of the reasons for UBH's denial of benefits: partial hospitalization was the appropriate level of care under UBH's Guidelines and the Plan's definition of medical necessity. Further, there is no evidence that should have prompted the district court to accord more weight to the procedural deficiency. The record contains no evidence that O.D. complained that the link to the UBH Guidelines in the benefit denial letters she received did not work at the time she received the letters or that she requested a copy of the Guidelines from UBH at that time. The record indicates instead that O.D. waited two years after her denial of benefits to request a copy of the Guidelines, and she failed to alert the court to any deficiencies in the administrative record until several months after that request. O.D. thus failed to show how the technical deficiencies "hinder[ed] effective administrative review." *Perrino*, 209 F.3d at 1318.

We have never addressed the effect of substantial noncompliance with ERISA procedural regulations on the deference owed to a plan administrator's adverse benefits determination. We have treated other procedural errors, including conflicts of interest, as "merely a factor for the district court to take into account when determining whether an administrator's decision is arbitrary and capricious." *Doyle*, 542 F.3d at 1360. Many of our sister circuits have held that insubstantial

10

procedural errors do not decrease the deference owed to ERISA plain administrators. *See, e.g.*, *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 831–32 (8th Cir. 2014) (holding that minor procedural errors in claims handling process did not warrant decreased deference); *Lafleur v. La. Health Service & Indem. Co.*, 563 F.3d 148, 159 (5th Cir. 2009) (holding that even substantial non-compliance with ERISA procedural regulations did not warrant modifying arbitrary and capricious standard of review). Because UBH substantially complied with ERISA's notice requirements, its decision was not arbitrary and capricious on that basis.[6]

### C.  UBH's Medical Necessity Determination

The coverage decision of a plan administrator is not arbitrary and capricious if "reasonable" grounds supported the decision. *Blankenship*, 644 F.3d at 1355. "Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians." *Id.* at 1356. And administrators "may give different weight to [certain doctors'] opinions without acting arbitrarily and capriciously." *Id.* As long as there is a reasonable basis in the record for UBH's decision, it "must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion." *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008).

---

[6] We express no opinion on whether a flagrant procedural violation would alter the standard of review.

O.D. argues that UBH's decision was arbitrary and capricious because UBH failed to credit the opinion of treating psychologist Dr. Lacy.  Dr. Lacy opined that residential care was appropriate because, among other things, O.D. "consistently reported that she was only able to abstain from behaviors because she was under constant supervision."  But the existence of contrary evidence in the record, even from a treating healthcare provider, does not compel reversal.  *See, e.g.*, *Blankenship*, 644 F.3d at 1356 ("Even where [the plaintiff's] own doctors offered different medical opinions than [the administrator's] independent doctors, the plan administrator may give different weight to those opinions without acting arbitrarily and capriciously."); *Doyle*, 542 F.3d at 1358 (holding administrator had reasonable basis for denial where it "considered Doyle's medical records" and employed "two independent physicians to review those records" along with its own reviewing physician); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that plan administrators are not required to accept opinions of claimant's treating physicians over the conflicting opinions of reviewing physicians).  Moreover, Dr. Lacy is not a physician or psychiatrist, did not apply UBH's Guidelines to her decision, and never opined that O.D. could not safely be treated using partial hospitalization.

There is a reasonable basis to support UBH's decision.  Four separate board-certified psychiatrists reviewed O.D.'s medical records.  Those psychiatrists

12

determined that partial hospitalization with drug testing and monitoring for self-injury "with appropriate interventions" was the clinically appropriate level of care. When O.D. was admitted, she had never attempted suicide, had no plan to self-harm, was at a healthy weight, and had no other medical conditions that rendered her medically unstable. From that point, she only continued to improve. After a few days at Veritas, O.D. was actively engaged in therapy, reported reduced urge to binge and purge, had no suicidal ideation, was enjoying and completing her meals, and continued to maintain a normal weight. Although O.D. needed structure around meals, because the partial hospitalization program was every day, Veritas could still provide structure and monitoring. Veritas allowed O.D. to go on outings. There was no indication that O.D. binged or purged during those outings. Although O.D. was experiencing some urge to binge and purge, there is no indication that there was any serious threat to her physical or mental health that required around the clock care.

The evidence shows that O.D. had serious mental health problems. But because there is a reasonable basis to support UBH's decision, it was not arbitrary and capricious for UBH to only approve coverage for O.D.'s partial hospitalization.

### III. Conclusion

13

The district court properly concluded that UBH's decision was not arbitrary and capricious, and we affirm.

**AFFIRMED.**